**E. F. DREW & CO., Inc. v. REINHARD.**

**No. 46, Docket 21052.**

United States Court of Appeals
Second Circuit.

Nov. 3, 1948.

680

Watson, Bristol, Johnson & Leavenworth, Tracy R. V. Fike and Harry C. Bierman, all of New York City (Leonard A. Watson, of New York City, of counsel), for appellant.

Klein, Alexander & Cooper, of New York City, and Guy W. Calissi, of Woodridge, N. J., for appellee.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

L. HAND, Chief Judge.

This is an appeal from a judgment dismissing the complaint in an action to compel the defendant, Reinhard, specifically to perform a contract to transfer to the plaintiff an invention made by him while in its employ. The only issues are: (1) whether the contract of employment gave to the plaintiff the right to inventions made by the defendant; and (2) whether the defendant made the invention while he was in the plaintiff's employ. The judge found that the plaintiff had failed to prove that the contract did give to the plaintiff the right which it claimed; but made no finding upon the second issue. The substance of the evidence, so far as it is necessary to state it, is as follows:

On January 2, 1930, Reinhard and two others—Whitlock and Hainley—organized a corporation, known as the American Colloid Corporation, one-half of whose shares were issued to one Drew, and the other half were divided equally between Whitlock, Hainley and Reinhard. The company contracted with these three that Whitlock should be sales manager at $700 a month; Hainley, plant manager at $400 a month; and Reinhard "Chief Chemist" at $550 per month. In addition to their salaries, they were to divide among themselves fifteen percent of the net profits after the payment of a preferred dividend. The defendant testified that he and Whitlock operated and managed the administrative side of the company in New York, while Hainley was primarily engaged in operations at the plant in Boonton, New Jersey. He described his own duties as involving "primarily sales work, writing of technical literature, advertising matter, drawing up forms, establishing methods of analysis and control on boiler water, the handling of salesmen's reports, the management of the office staff, watching expenses, costs, handling formulations, establishing plant control conditions, and in general the general management of the business with the possible exception of having

final say in the matters of finances." However, he spent from five to seven percent of his time in the laboratory "either working directly or in a supervisory capacity," although this was primarily to check the work of subordinates and to give them instructions, and occasionally to make a test of what they had done. The work of the company was principally to prevent water, fed to boilers, from developing a scale on the inside of the boiler; but it also included making paints, coating, auto specialties, protective hand-creams for mechanics and "laundry blue." On October 1, 1934, the defendant and the company made a new contract by which he merely agreed to "devote his entire time and energy to the furtherance of the business of Colloid under the supervision and direction of the Board of Directors." This agreement, in containing no covenant to transfer any inventions to the company, differed from the contracts made with other employees which did contain such a covenant.

Differences arose between the company and Reinhard which culminated in 1945 in his withdrawal; but when he left, concededly he made no claim to a number of formulas used in the business which he had devised while he was with it. Moreover, he had assigned to the company an application for a patent for cleansing the interior of combustion engines and the like, which he had invented in cooperation with an employee, named Amthor. A little over a year before he left the company he submitted to it an "Inter-Office Letter" (February 29, 1944), whose subject he entitled: "Outline of Suggested Projects for Investigation and Development for the American Colloid Division." This began by declaring that Reinhard was submitting an "outline of problems and suggestions of approach, pertinent to the operations of the American Colloid Division, and which if prosecuted to a successful culmination, could be commercialized upon to more or less degree." The first of the subjects discussed was "Boiler Water Treatment," followed by three others which need not concern us. Having outlined the projects, he took up in detail "Boiler Water Studies," in the course of which he said: "a novel method of making a colloidal iron hydroxide, relatively free of salts is known to me and this, the most difficult phase, is easily overcome. This would not have to be developed. * * * A short step removed from the principle of iron hydroxide and its resulting floc as internal boiler coagulant, would be the utilization of a magnetic floc of iron hydroxide, the preparation of which also is known to me and presents no particular problem." He then went on to explain the advantages of such a "floc," and to say: "Search will, I believe, reveal that these principles will in more than one way be subject to good sound patent protection, thus giving us exclusive rights to these advances in this science and art, advantages over competition and merchandising advantages that will be welcomed by any sales organization." Later on, in speaking of the possibility of commercializing the work of another employee, Pollack, he said: "this work, in connection with coagulation with colloidal alumina (process of preparation also known to me) colloidal iron hydroxide, magnetic floc, etc., may well enable us to become well established in this related line of endeavor." Finally, after discussing the other activities of the plaintiff, he concluded: "Such are the many problems in our diversified line of business. It is an auspicious program on which the best concentrated cooperative efforts are demanded. Suggestions for approach and coordination of effort will be appreciated." Reinhard testified that he prepared this letter only to show his qualifications as a chemist, and that he did not mean by it to describe his legal relations with the plaintiff.

On February 8, 1945, a few months before he left the company, he wrote a letter to Whitlock, in which, after complaining how much the business had changed since he and Whitlock had founded it, he said: "The products have all been virtually mine to more or less degree. * * * The auto products are hooking on well and they were my idea. Radiator cleaner was my patent. Duosol was mine. Fuel Oil Treatment Crankcase treatment and all." This letter he ended thus: "But, besides what I have originated for Drew, my mind hasn't been idle. There are more where they came from and I can assure you I have some beautiful ideas. Next time they'll be ex-

ploited by me for my sake and not for some-one else to grab off till he thinks he has the cream and then kick me in the tail. No, I've learned my lesson and I'm certain that the change I'm making will benefit me greatly, financially, as to prestige, position, ego, pride and all that goes with it."

As to when Reinhard had made the invention—the second issue—he testified: "The basic idea for the magnetic floc predated my employ by the American Colloid Corporation. * * * It occurred at a time while I was still engaged pursuing my studies at Cooper Union Night School, which would be about 1923 or 1924." Again: "on an experimental basis, on what might be termed a basic experiment, during the discussions that occurred while I was pursuing my studies at Cooper Union my curiosity was aroused. It was at that time that I demonstrated to my satisfaction that floc prepared in that particular manner would be magnetically attracted." He added that the demonstration that had in this way satisfied him was substantially the same as that which he later made at the company's plant in Boonton "with the exception that in one demonstration at Boonton there was an additional material present which prior witnesses did not emphasize, and that was the presence of animal charcoal." He first disclosed his invention to one, MacKenzie, a fellow employee of the company, sometime in 1937; and he made the same demonstration of it then as thereafter.

█ The defendant insists and the judge agreed that in such cases if the employer is to get more than a license, or "shop-right" in an employee's patent, it must appear that he was employed to make inventions; or, if the employment was general, that there was a covenant to assign, which would not be implied merely from the fact that the invention was in the same field as the employment, and was made by the use of the employer's tools or materials.[1] The plaintiff answers that, even though

this may be the law in federal courts, it is not the law in New York or in New Jersey, by which the contract at bar must be interpreted. We doubt that there is any substantial difference between the "federal law" on the subject and the law of New York. For example, Burr v. De La Vergne[2] concerned a partnership (where one would suppose it would be easier to raise up an implied covenant than in the case of mere employment), yet Judge Andrews said (102 N.Y. page 419, 7 N.E. page 367): "one partner acquires no right or interest, legal or equitable, in an invention made by his copartner during the existence of the partnership, by reason merely of the partnership relation, although the invention relates to an improvement in the machinery to facilitate the business carried on by the firm, and although the partner making the invention, uses copartnership means in his experiments, and is also bound, by the copartnership articles, to devote his whole time and attention to the firm business". That decision, so far as we can find, still represents the law of New York.[3] On the other hand it is uniformly held that an employee, and a fortiori a partner, may promise that he will assign all inventions which he may make, and the courts of New York, as well as those of other jurisdictions, enforce such contracts specifically.[4] Nor need the contract be express any more than any other contract; as the Restatement of Agency[5] well puts it: "For the employer to be entitled to a patent it is not necessary that the contract should specifically so provide." It "is a question to be decided upon all the facts of the individual case." In short, such a contract may be implied from the relations of the parties.

█ In deciding whether in the case at bar there was such an implied contract we accept as true Reinhard's description of his duties and his activities as "Chief Chemist"; but the question remains whether both he and the company understood that the company was to be entitled to any inventions

[1] United States v. Dubilier Condenser Corporation, 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488.

[2] 102 N.Y. 415, 7 N.E. 366.

[3] Burden v. Burden Iron Co., 39 Misc. 559, 569, 80 N.Y.S. 390; Doscher v. Phelps Guardant Time Lock Co., 89 Misc. 561, 153 N.Y.S. 710, affirmed 172 App. Div. 954, 157 N.Y.S. 1123.

[4] Klauder-Weldon Dyeing Machine Co. v. Weldon, 166 App.Div. 415, 151 N.Y.S. 1068.

[5] § 397 Comment (a).

which he might make; or, at least, to an invention which so nearly concerned its business as the one in suit. There is, of course, no doubt that this was the plaintiff's interpretation of their relations, nor can there be any, in the face of the "Inter-Office Letter," that Reinhard understood that, as to the invention in suit, the plaintiff had at least a license, or "shop-right." Whether his understanding went further, and included a transfer of the invention is the only possibly debatable point. It seems to us that both in that letter, and in his letter to Whitlock a year later, he made it clear that—like the plaintiff—he too did understand that it was to be the owner of the invention. In the first place we are to keep in mind that he was in effect a partner in the business and therefore interested in its success, and that the letter of 1944 was an agenda for future "development": for projects "which could be commercialized." These might, indeed, continue even though he left the company provided it retained a "shop-right"; but it might then be forced to meet his own competition, or that of any whom he might choose to license. Considering how close the invention was to the principal business, that interpretation of his meaning is on the face of it somewhat forced. However, what he said later much increases its improbability. Consider, for example, the passage in which he spoke of the "patent protection" which was to give "us exclusive rights to these advances * * * advantages over competition * * * that will be welcomed by any sales organization." That was certainly most misleading, if it was an implied condition that when "we" had obtained these exclusive competitive advantages, they were subject to defeat by his withdrawal. No "sales organization" would hasten to "welcome" a contribution so tenuously protected. Or again, if the "magnetic floc" in connection with Pollock's work might "well enable us to become well established in this related line of endeavor," was the "established" line to be at the mercy of disestablishment by Reinhard's competition, if he left the company? And finally, was the "auspicious program," which he had opened, to be carried out upon the assumption that he might later himself seek to frustrate it; and did not the "con-centrated cooperative efforts" which it "demanded," at least presuppose that he should not interfere? Good faith—the most elementary good faith as it seems to us—required such a construction of the "program" as a whole.

However, if any doubt remains, it is laid by the letter to Whitlock written a year later on the eve of his retirement. Surely, then if ever, we should expect him to put upon his relations with the company that interpretation which he now asserts. Not a whisper of it can be heard. The whole burden of his complaint—and the whole letter is one of complaint—was that he had in this instance put himself in the unfortunate position of allowing Drew "to grab off" his inventions and then to turn him out. He had "learned his lesson"; "next time" his inventions would "be exploited" by himself. That is not the language of a man who supposes that he retains any interest in his past inventions; it is meaningless except on the assumption that he has been foolish enough to barter away his birthright for a mess of pottage. It is not, therefore, necessary to resort to the strongly corroboratory circumstances of his assignment of the joint invention of himself and Amthor; or to the fact that he laid no claim to the formulas which he had devised, and which would appear to be in exactly the same position as this invention. Moreover, the decision of the second issue follows from the first. It is reasonable to believe that he had not even fully articulated the invention before 1930; but, that aside, certainly he had never put it to that test which alone gave it a patentable date. However, the whole issue is really beside the point; for, regardless of when he made the invention, in the "Inter-Office Letter" he grouped its exploitation along with those other "projects" which the company was to develop. That showed that he assumed that it went with the rest.

It may be well in conclusion to say a word about the finality of the finding which we are reversing. It is true that the contract was not in writing—though a written contract was part of it—and, had the case been tried to a jury, it is they who would have had to find the "intention of the parties," had the evidence left it in doubt.

That "intent" is indeed a question of fact, though it is a hypothetical question, for its answer demands that the tribunal, judge or jury, declare what the parties would have agreed to, had the occasion for which they had not specifically provided, been presented to them. When an appellate court is faced with that question, it is in substantially as good a position to answer it as the trial judge, provided it accepts as true all the oral testimony as we do here, so far as it was relevant. We yield to findings of fact, so far as those parts of the evidence which cannot come before us may have controlled their decision; we must assume that these evanescent factors may have been persuasive, unless what does come before us rationally forbids the conclusions, no matter what the unknown factors were. After giving them every possible probative force they might have, our problem therefore becomes the same as that before the trial court. In the case at bar, as we have said, we proceed upon the assumption that all that Reinhard said was true; assuming as much, his letters make plain what he really believed.

Judgment reversed; decree to be entered for the plaintiff.