## FORBERG v. SERVEL, Inc.

United States District Court
S. D. New York.
Dec. 12, 1949.

504

Hays, St. John, Abramson & Schulman, New York City (James R. Cherry and Morris Shilensky, New York City, of counsel), for plaintiff.

Spence, Hotchkiss, Parker & Duryee, New York City (Kenneth M. Spence, New York City, and Thomas L. Howe, New York City, of counsel), for defendant.

COXE, District Judge.

This is a motion by defendant for summary judgment. The motion is based upon the pleadings, the examinations before trial of plaintiff and other witnesses and the exhibits produced upon such examinations, and an affidavit of defendant's attorney. There is also an opposing affidavit by plaintiff. The action is brought to recover the sum of $2,000,000, alleged to be the reasonable value of the use by defendant of plaintiff's patented invention. Jurisdiction is based upon diversity of citizenship. Plaintiff has demanded a jury trial.

The complaint alleges that on January 26, 1937 a patent was issued to plaintiff for an invention in a gas burner (this is clearly a mis-statement, for the patent shows on its face that it was issued to defendant as assignee of plaintiff); that on August 27, 1934 the application for the patent had been assigned, at its request, to defendant's predecessor, Electrolux Servel Corporation, which on October 24, 1935 had assigned it, together with all its business, to defendant (both companies will hereafter be referred to as "Servel"); that Servel has made, sold and used gas refrigerators operated by gas burners embodying plaintiff's invention to the extent of more than 2,000,000, and is continuing to do so; that the fair and reasonable user value of the invention is at least one dollar per unit, which defendant is obligated to pay plaintiff as reasonable royalty upon the use of the invention.

The answer admits that the patent was issued, as alleged, but to defendant and not to plaintiff; admits that the application for the patent was assigned to Servel, but not at its request, as alleged; admits that defendant has made, used and sold 2,000,000 refrigerators embodying the patented invention; and denies the alleged user value of the invention and that defendant owes plaintiff any amount therefor. The six- and ten-year statutes of limitation are pleaded as defenses.

The complaint states no ground for recovery except the mere use of the invention by defendant. No express agreement providing for payment is alleged. Although plaintiff asserts, in his opposing affidavit, that he was coerced into assigning his invention to defendant, he admits that "this is not an action for rescission but is grounded on a continuing right to be compensated for each use which the defendant makes of my invention". .

The motion for summary judgment is based fundamentally upon two grounds: (1) That plaintiff was employed to invent, and his invention, therefore, belonged to his employer, and (2) that, in any event, the assignment of the invention to Servel was made freely and voluntarily for the full consideration promised. Thus, two questions are presented: viz., (1) the nature of plaintiff's employment, and (2) the circumstances under which the assignment was made. All the persons who had any part in the transactions were examined, and cross-examined, before trial, and many letters and other papers were received in evidence. The facts relevant to these two questions were fully developed, and plaintiff makes no contention to the contrary. There is no genuine issue as to any material fact.

The testimony of plaintiff was as follows:

He was graduated from the Kristiana Teknical Skole, in Norway, in 1923 or 1924, with a degree in electrical engineering, and came to the United States in December, 1925. For a couple of years he was with the Detroit Edison Company, doing electrical designing. From May, 1931 to 1941, or 1942, he was employed by Consolidated Gas Company and its successor, Consolidated Edison Company, in New York City, in its appliance testing, or sales utilization, laboratory as a "staff member", at a salary of $35. weekly. He received no additional compensation at any time. There was no written contract of employment. As to the nature of his duties, he testified that he was a testing engineer, making performance and efficiency tests on all kinds of gas appliances, but mainly gas refrigerators, and that he was the principal person who worked on refrigerators. Haby was the manager or superintendent of the laboratory under Walker, who had general supervision over the laboratory, visiting it two or three times weekly.

In 1931 Servel was manufacturing refrigerators, using gas burners, for which Consolidated acted as selling agent in the New York City area, servicing at considerable expense the refrigerators which it sold. Consolidated's service men were getting many complaints of combustion trouble, the result principally of faulty flame combustion caused by clogging of the screen, through which the air passed to the burner, by dust, and lawsuits were also brought against Consolidated by customers who claimed that their health had been affected by carbon monoxide resulting from such faulty combustion. In 1931 Haby assigned plaintiff to work on Servel refrigerators, and, under instructions of Haby, and as "one of his regular assignments and part of his ordinary laboratory duties", plaintiff started investigating the performance of the Servel burners, devoting part of his time to that work. Late in the year Walker took over direct supervision of the work on refrigerators, and plaintiff thereafter reported directly to him.

In the fall of 1932 Walker told plaintiff that Consolidated should concentrate on reducing service costs on the refrigerators and instructed him to do something to eliminate the combustion trouble, particularly the dust trouble. Plaintiff agreed, and from that time on devoted the major part of his time in the laboratory, and much time at home, in an effort to solve the problem. All his work was done under Walker's instructions. In 1932 and 1933 Walker frequently discussed the problem with plaintiff, making suggestions but not telling him in detail what to do or how to do it, or suggesting any solution of the problem. Consolidated furnished the laboratory space, where the physical work was performed. Some of its employees assisted by making models and laboratory tests. Field tests were carried out by its employees on refrigerators especially installed for the purpose; and, apparently, Consolidated furnished the materials used, although plaintiff, on his examination, was instructed by his attorney not to answer such questions. After some months of experimentation, plaintiff finally produced the dust tube sleeve which is the subject of the patent, and which, by drawing the air directly into the flame where the particles of dust are consumed, or sucked up by the draft in the flue and expelled, eliminated the clogging of the burner screen. The device was perfected at the end of 1933, or early in 1934, and was soon adopted by Servel for use on its refrigerators.

Plaintiff's testimony continued: The dust tube sleeve was invented for use on Servel refrigerators, and Walker felt that it was a very promising solution of the problem and said that they should by all means try to have Servel take it over and start using it. Plaintiff then talked to Smith and Hainsworth, of Servel, but they did not seem much impressed, or did not want to bother about trying to adapt the sleeve to their burner. Walker and plaintiff decided, however, to have a sufficient number of sleeves made so that comprehensive laboratory and field tests could be made, and this was done over a period of several months.

In the fall of 1933, when plaintiff was "actually sure" that the dust tube sleeve "was a successful idea", he asked Walker "to get me a patent on it through the Consolidated Gas, so we could assign it to Servel"; Walker was agreeable but replied that he would have to take it up first with N. T. Sellman, who was the head of Consolidated's sales and utilization department. Several weeks later Walker told plaintiff that Sellman thought that the use of the sleeve should be turned over to Servel and had refused to go along, but, later in the year or early in 1934, Walker told plaintiff that Servel intended to take out a patent on the sleeve in plaintiff's name and asked him to "please sign papers". Plaintiff replied that he "certainly did not have any objections to it using my name", and asked Walker how much Servel was willing to pay him. Walker replied that there "might be a bonus", that Servel would pay him but that he did not know how much. Plaintiff did not say how much he wanted, and never spoke to Walker again about payment.

At that time, or later, Walker told plaintiff that "certain papers had to be signed in connection with Servel taking out this patent in my name". Plaintiff admitted that he signed the assignment and patent papers on May 15, 1934, and the second assignment on August 27th, but had no recollection as to where or what was said on either occasion. He testified that neither he nor Walker decided that the invention should be turned over to Servel, that neither Sellman nor anyone connected with Servel talked with him about the matter, and that he talked only with Walker. He testified further that "Servel was in the picture all the time. The burner was invented for use on Servel".

In May, 1934 Walker, or his secretary, notified plaintiff to go to Servel's office on 42nd Street and receive a check. He did so and received the $50 check from someone. He is sure that Sellman did not give it to him. He thought he received it after he had signed most of the papers. He said that he immediately went across the street and cashed it (the check was drawn on the 42nd Street branch of the

Central Hanover Bank & Trust Company, is dated May 9th, and the stamp indicates that it was cashed on May 11th). He was not told at any time, nor did he ever at any time agree, that the $50 check was to be full and final payment for his invention.

Plaintiff had no counsel, never retained Heath (Servel's patent attorney), whom he did not know, and never told Walker that he (Walker) could act for him. From 1934 to 1948, he never asked anyone for any money for his patent. He knew of the use of the sleeve by Servel from the beginning, and of the volume of Servel's sales of refrigerators until at least 1937 or 1938, but did nothing.

In July, 1933 he and Walker had applied for a patent, which was issued on November 6, 1934, on a safety device for gas pilots, which they had invented jointly and assigned to Consolidated; he received one dollar from Consolidated, and never asked for more.

In his opposing affidavit plaintiff stated that he was not paid to invent the device and had no contract requiring him to transfer his invention to Consolidated, and that Sellman exercised undue domination and control over him.

Walker testified as follows:

He is a graduate engineer and has been employed by Consolidated since August 1926 as an engineer in utilization, with supervision over Consolidated's laboratory. He employed plaintiff in 1931 as one of the regular test men in the laboratory, which averaged ten in number, in connection with appliance testing and appliance problems. He testified that plaintiff's duties "consisted of testing appliances which were submitted to us by manufacturers, and investigating problems which arose in connection with appliances which were being used by our customers, with an idea of eliminating or reducing troubles which arose in the operation of such appliances", and that plaintiff reported directly to Haby and to himself.

About the middle of November, 1932, at the suggestion of Sellman, he discussed with plaintiff the question of devising a means for overcoming primary air stop-

pages in small gas burners, pointing out the serious problem which existed, and giving him specific instructions to follow, including taking the air for combustion from around the flame; he talked with him frequently, giving directions and instructions. Plaintiff carried out his instructions and made a series of tests of different variations of the burner design which he had outlined, with promising results. Plaintiff did not make any models or tests of a dust tube burner, or do any work on one, until Walker spoke to him about it. Servel's mechanics did some of the fabrication work on some of plaintiff's models, but which ones Walker did not remember.

On January 24, 1934 Walker sent to Hainsworth, head of Servel's engineering department, a memorandum in which he recited something of what had been done in connection with the development of the dust tube burner, stated that the original dust tube had been made entirely by plaintiff, and recommended that if it was to be patented, it should be in plaintiff's name. Hainsworth replied that, as soon as feasible, Servel's patent department would have a search made to determine whether the burner dust tube was a patentable feature. On March 7, 1934 Walker wrote Hainsworth again that he believed that it would be worth while, both to Servel and to Consolidated, to procure a patent, that he had discussed the matter with Sellman, who approved the plan of having Servel take out a patent in plaintiff's name, with rights on refrigeration assigned to Servel and on all other purposes to Consolidated, and that, if the plan should be carried out, plaintiff would be very receptive to the $50 advance which Servel made, in the case of patents, to its own laboratory staff. Hainsworth replied that it was agreeable to have the patent obtained in plaintiff's name and assigned to Servel, with a separate agreement assigning all rights in the dust tube, other than the rights on refrigeration, to Consolidated; that Servel's patent department advised that the only patentable feature was extending the dust tube to a point adjacent to the flame; that, some little time before, the bonus on patent applications in Servel had been reduced from $50 to $25, and that

Servel, therefore, would be able to give plaintiff only $25.

Walker's testimony continued. He took the initial step about taking out a patent, plaintiff never having said anything about the matter prior to January 24, 1934. Shortly prior to March 7, 1934 he talked with plaintiff about the plans under discussion of Servel taking out a patent and giving him the same payment which their own people who were granted patents got, as opposed to the one dollar which was paid where patents were taken out directly through Consolidated, and plaintiff expressed himself as quite agreeable; it was his suggestion after consulting with Sellman, and not plaintiff's, that Consolidated should have all the patent rights, except the refrigeration rights which Servel should have. Plaintiff never asked him to secure a patent in plaintiff's name.

When Sellman received Heath's letter of May 9, 1934 Walker asked plaintiff to come to Sellman's office, telling him that Sellman wanted to give him a check; the $50 check was given to plaintiff in Sellman's office, in Walker's presence; plaintiff made no particular comment, but seemed to be happy; plaintiff took the assignment, patent application and other papers with him to go over, and returned on the 15th and signed all the papers in Walker's presence, without any particular remarks; plaintiff signed the second assignment on August 27th, in Walker's presence, also without making any statement; plaintiff never protested against signing any of the papers; Walker never asked plaintiff what he wanted for his invention; plaintiff never said that he should get more money, or demanded any more money, and Walker never told plaintiff that he would or should get more than $50.

Plaintiff never asked Walker to retain an attorney for him; he and plaintiff had previously patented another device, but had no agreement with Consolidated as to payment of royalties thereon. Walker told plaintiff that the patent could easily be taken out by Servel, without any work or expense on the part of Consolidated, and that plaintiff would have the same prestige as he would have if it were taken out in the same manner that had been used with their

joint patent, and that he would get for plaintiff the $50 fee which Servel paid their own laboratory men, instead of the customary fee of one dollar from Consolidated.

Sellman's testimony was as follows:

He had been director of sales and utilization of Consolidated since 1930. He asked Walker to investigate the problem caused by the clogging of gas burners on Servel refrigerators which Consolidated had installed. There were two possible approaches—one, to put on a great deal larger size of screen, and the other to see if the dust and lint could not be consumed by, or incinerated before, the air reached the primary air opening on the burner. Walker reported to him from time to time that work was in progress in the laboratory. He believed that it was Walker who first suggested to him that a patent should be taken out, but did not recall whether Walker asked him to have the patent taken out in plaintiff's name with the assistance of Consolidated.

When he received Heath's letter of May 9, 1934, the matter having been discussed with him by Walker, he knew about the situation to which it referred, which was an arrangement whereby plaintiff was to assign his invention and his rights to the patent to Servel. All the discussions or negotiations between Consolidated and Servel had been carried on by Walker, but he instructed plaintiff, through Walker, to assign the patent to Servel for refrigerator purposes.

Heath's testimony was as follows:

He is a patent attorney, admitted to practice before the U. S. Patent Office, but is not a member of the bar of any State. He has been employed by Servel as its patent attorney since 1930. He first heard of plaintiff early in February, 1934, when Hainsworth sent him Walker's letter and notes of January 24, 1934 and suggested that nothing be done for the present in view of his belief that there was only a scant margin of patentability in plaintiff's dust tube sleeve. Similar burners with a tube were well known in the art, but plaintiff's device had the tube running a little nearer the flame than the prior art, which, in his

opinion, made the device patentable, and he had a patent infringement search made; the problem which plaintiff's invention was calculated to solve was one common to all small gas burners, viz., stoppages resulting from dust in the air; the effect of the invention was to consume a good portion of the dust in the flame, which eliminated, to some extent, the amount of servicing needed.

After the correspondence between Walker and Hainsworth in March, Heath prepared, without assistance from plaintiff or Consolidated, the patent application, containing a power of attorney to himself, specifications, claims and drawings, and forwarded them on May 9th to Sellman with a letter in which he requested that the inventor, who, he had been advised, was Forberg, be asked to review them and, if satisfactory, to sign them and return. He also enclosed an assignment of the invention to Servel, for execution by the inventor, and a check to Forberg's order for $50, and wrote that, as soon as the application had received a file number in the Patent Office, he would send a license giving Consolidated patent rights outside of refrigeration. All this he did without consultation with plaintiff, whom he had never met, relying upon what either Sellman or Walker had told him, viz., that Walker would like to see the application filed in plaintiff's name, and thought it would be a good idea if Servel took out the patent so that plaintiff could get the $50 which it was the custom of Servel to pay its own employees when an application was filed by one of them. So far as he knew, there was no discussion or communication with plaintiff by anyone connected with Servel as to assigning the invention, or any agreement as to compensation. Heath sent to Sellman on August 24th, in accordance with the oral agreement between Sellman and Hainsworth, made in March, an exclusive license from Servel to Consolidated for uses other than in refrigeration apparatus, to become effective August 31st. In December, 1936, after the application had been allowed by the Patent Office, plaintiff executed, at Heath's request, a supplemental oath which was filed in the Patent Office.

Consolidated paid no royalty or other consideration for the license, and Servel never paid any money to either Walker or Sellman. Plaintiff himself never made any request upon Servel for money, but his attorneys did so shortly before this suit was instituted in January, 1949.

The question whether plaintiff was employed to invent is a question of fact. E. F. Drew & Co. v. Reinhard, 2 Cir., 170 F.2d 679. Here the evidence does not justify a finding that at first plaintiff was so employed, for it is clear that what work he did in 1931 upon Servel refrigerators was one of his regular assignments and part of his ordinary laboratory duties. But when, in the fall of 1932, as plaintiff himself testified, Walker, his superior, told him to concentrate on reducing service costs on the refrigerators and to do something to eliminate the combustion trouble, particularly the dust trouble, i. e., to solve a particular problem, he became employed to make an invention, if an invention would solve the problem, even though he had not been so employed originally. Houghton v. United States, 4 Cir., 23 F.2d 386, 390, certiorari denied 277 U.S. 592, 48 S.Ct. 528, 72 L.Ed. 1004. Having been so employed, his invention became the property of his employer and he was bound to assign it, and any patent obtained thereon, to his employer. United States v. Dubilier Condenser Corp., 289 U.S. 178, 187, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488; Solomons v. United States, 137 U.S. 342, 346, 11 S.Ct. 88, 34 L.Ed. 667; Kober v. United States, 4 Cir., 170 F.2d 590, 594, certiorari denied 336 U.S. 945, 69 S.Ct. 812; Hebbard v. American Zinc, Lead, & Smelting Co., 8 Cir., 161 F.2d 339, 342.

These principles are recognized and applied by the New York courts. See Doscher v. Phelps Guardant Time Lock Co., 89 Misc. 561, 153 N.Y.S. 710, affirmed on opinion below 172 App.Div. 954, 157 N.Y.S. 1123, affirmed without opinion 224 N.Y. 718, 121 N.E. 865; Burden v. Burden Iron Co., 39 Misc. 559, 565, 569-570, 80 N.Y.S. 590; Klauder-Weldon Dyeing Machine Co. v. Weldon, 166 App.Div. 415, 151 N.Y.S. 1068; Burr v. De La Vergne, 102 N.Y. 415, 7 N.E. 366; and the statement by Judge Learned Hand in E. F. Drew & Co. v. Reinhard, supra.

Thus Consolidated Gas Company, plaintiff's employer, became the owner of his invention and had the right to require that the invention be assigned to it. Having such right, it also had the right to direct that the invention be assigned to Servel, or to anyone else whom it might select. The assignment from plaintiff to Servel is thus unassailable, unless plaintiff was compelled by coercion, or by the undue domination and control of Sellman, as he claims, to make the assignment. But there is not the slightest evidence that any coercion, or undue domination and control, was exerted by Sellman or by anyone else. Plaintiff testified that he knew Sellman by sight, but that he never spoke to plaintiff about turning over the invention to Servel. The assignment was made freely and voluntarily by an intelligent man who knew from his own experience the year before what an assignment meant, and who received, without protest, the full amount which he had been assured he would get. His claim that he did not receive the check as full payment comes rather belatedly, after fifteen years of inaction with full knowledge of the use of his invention by defendant during all these years.

The case of Matarese v. Moore-McCormack Lines, 2 Cir., 158 F.2d 631, 170 A.L.R. 440, relied upon by plaintiff, is not pertinent, nor is it opposed to the preceding authorities. Matarese, a stevedore employed by the defendant, had invented a device which would facilitate the loading and unloading of cargo on vessels. He was not employed by the defendant to invent such a device; in fact, he made the invention at his home, on his own time, and without the knowledge of his employer. He exhibited models of the invention and demonstrated their operation to defendant's agent in charge of the pier upon which he was working, who promised him one-third of what the defendant would save by use of the device. Matarese then supervised the construction of a number of the devices upon defendant's premises and with its materials, which devices the defendant used. Matarese applied for patents, which were

later issued to him. Defendant, however, never paid him anything, except his regular wages, and about three years later he was discharged. Matarese then sued to recover the reasonable value of the use of his invention, upon the theory of unjust enrichment, and a verdict in his favor was affirmed under the circumstances. Manifestly, the facts are so different from those here that there is no analogy between the cases.

Nor does the case present any question of violation of fiduciary relations in view of the utter lack of evidence showing coercion, domination or control, or fraud.

Defendant's motion for summary judgment is granted.