RAMÓN R. WOLFF ABOY, Plaintiff and Appellant, *v.* JOSÉ HERNÁNDEZ USERA ET AL., Defendants and Appellees.

No. 10904. Argued April 2, 1954.—Decided June 2, 1954.

*J. J. Ortiz Alibrán, Félix Ochoteco, Jr.* and *Gerardo Ortiz del Rivero,* for appellant. *Córdova & González* for appellees Noble, Hernández Usera, Vázquez de Hernández and Hernández Vázquez. *Santiago Polanco Abréu* for appellees Vidal Aboy.

MR. JUSTICE ORTIZ delivered the opinion of the Court.

Plaintiff herein appealed from a judgment entered by the San Juan Part of the Superior Court dismissing a complaint for the annulment of a document dated September 1, 1928 which was protocolized as the holographic will of

Encarnación Aboy Widow of Cintrón, pursuant to an order of August 26, 1949. The complaint claimed that the will was spurious and unauthentic. In the opinion rendered, it is stated in part as follows:

"Encarnación Aboy, widow of Luis Manuel Cintrón, died on August 16, 1949, leaving no ascendants or descendants.

"Under date of August 26, 1949, at the request of José Hernández Usera and after proper steps were taken, this Court entered an order ordering the protocolization of Encarnación's holographic will. That document, which bears date of September 1, 1928, contains a legacy of $250,000 in favor of Gloria María Hernández, daughter of the spouses José Hernández Usera and María Vázquez, the latter being a niece of Encarnación, three legacies of $10,000 each in favor of Ramón Aboy and Ángela Aboy, brother and sister of Encarnación, and of José Hernández Usera, and five legacies of $2,000 each in favor of the children of Rosa Aboy, Encarnación's deceased sister. The remainder of the estate, according to that document, was bequeathed to María Vázquez de Hernández. José Hernández Usera and Arturo Noble are designated as executors. The document provides that any legatee who assails the will judicially or extrajudicially will forfeit his legacy. Exhibit 1 of plaintiff.

"On February 9, 1950, Ramón Wolff, one of the nephews to whom a legacy of $2,000 was bequeathed in the document protocolized as Encarnación's holographic will, filed the complaint in the case at bar against the executors and legatees designated in the document in question, challenging the protocolized document on the ground that it was not written by Encarnación Aboy. As second cause of action, plaintiff questioned certain conveyances of real property belonging to Encarnación Aboy made by her attorney-in-fact, José Hernández Usera, to his son, José Luis Hernández, and by José Luis Hernández to María Vázquez de Hernández Usera. As third cause of action, plaintiff alleged that José Hernández Usera has administered Encarnación's estate since 1917 and that he never rendered accounts to her or to her heirs. Plaintiff urges that the protocolized document be declared null and void and that an open will executed by Encarnación Aboy on June 5, 1911 be held to be in force, whereby, and in view of the fact that

the heirs therein designated were deceased, Encarnación's brother Ramón and the descendants of her deceased sisters Ángela and Rosa would become heirs. Plaintiff further urges that the conveyances challenged in the second cause of action be declared null and void, and that defendant José Hernández Usera be required to render accounts on his administration of Encarnación's property since 1917.

"Defendants José Hernández Usera, María Vázquez de Hernández, José Luis Hernández, Gloria María Hernández Vázquez, and Arturo Noble answered the complaint, alleging that the protocolized document was written out in full, dated, and signed by Encarnación. As to the second and third causes of action, defendants alleged that, in view of the validity of the protocolized will, plaintiff has no interest or right to question the conveyances or to demand the rendition of accounts referred to in those causes of action. All other defendants were summoned and their default timely entered. The entry of default was thereafter set aside as respects defendants Enrique, Angelita, and Margarita Vidal Aboy, who filed an answer in which they neither admit nor deny the allegations of the complaint.

"As shown from the foregoing recital, the issue arising from the pleadings is whether or not the document protocolized as Encarnación's holographic will was written in her own handwriting.

"The case went to trial and the parties offered documentary and oral evidence on the genuineness of the contested document.

"In support of his theory that the document is spurious, plaintiff offered the testimony of two experts, Herman V. Bennett and Rafael Fernández Ruenes, and of Ramón Aboy Benítez, as well as ten specimens of Encarnación's handwriting, consisting of five letters written by her, two of them dated in 1928, one in 1938, and two in 1939, and photographs of five signatures affixed by her to public instruments, four of which were affixed before she became a widow (in 1901, 1905, 1906, and 1911), and the fifth in 1940.

"Defendants presented, and the Court admitted in evidence, a great number of letters, post cards, and other documents, allegedly written by Encarnación, and photographs of 29 signatures affixed by her to public deeds which date back to 1922 through 1931 inclusive. Defendants also offered the testimony of expert Albert D. Osborn and several other witnesses.

"On the basis of the findings of the evidence as a whole, the Court arrives at the following

CONCLUSION OF LAW:

"1. After an analysis and comparison of her handwriting and signatures with Encarnación's handwriting and genuine signatures, we conclude that the challenged document was wholly written and signed by Encarnación Aboy widow of Cintrón in her own handwriting.

"This conclusion is based on our own observation and in the light of the entire evidence presented, including the opinions and conclusions of the experts.

"Let us make a brief exposition of the main grounds of our conclusion.

"Let us consider first of all the theory and evidence of plaintiff, but befeore doing so it is well to state that the evidence of both parties discloses that there are two copies of the will in question, written by the same person, and substantially identical, although with certain variations, mainly orthographical. Each copy is spread out on four sheets of ruled paper with five signatures, one on the margin of each page and another at the foot of the last page. The evidence for the defense is that one of the copies, the protocolized copy (Exh. 1 of plaintiff), was delivered by Encarnación to José Hernández Usera in September 1928, in an envelope marked (in the same handwriting as the will):

'Holographic Will of Encarnación Aboy widow of Cintrón

San Juan, Puerto Rico
September 1, 1928'

"The other copy (Exh. 2 of plaintiff), according to the evidence for the defense, was saved by Encarnación until shortly before her death, when she delivered it to María Vázquez de Hernández in an envelope marked (in the same handwriting as the will):

'Copy

Holographic Will of Encarnación Aboy widow of Cintrón

San Juan, Puerto Rico
September 1, 1928'

"Plaintiff states in the complaint (Paragraph XIII) that he reached the conclusion that the protocolized will was spurious

upon comparing a photograph of the protocolized document with a photostatic copy which José Hernández Usera alleged was a copy of the protocolized document, noticing that they did not coincide. In other words, the existence of two copies and the fact that plaintiff received (from Lic. Hernández Usera) a photostatic copy of the copy which was not protocolized when he had asked for a photostatic copy of the will, led plaintiff to conclude that both copies were spurious. The speculations of the experts for plaintiff, based on the existence of two copies, also tend to establish the forgery of both copies.

"The evidence shows that the remittance to plaintiff of a photostatic copy of the will not protocolized was due to a mistake of Hernández Usera's attorney, resulting from the similarity of the two copies. As respects the existence of two copies, which fact, coupled with the mistake in sending the copy to plaintiff, convinced the latter, as alleged in the complaint, that the will was spurious, the evidence offers an account which is wholly consistent with the genuineness of the will. Among other elements of proof on this point, the most significant is perhaps a letter written on January 1, 1929 by Encarnación to Hernández Usera, the genuineness of which we have no reason to question, which proves that by that date she had executed an holographic will of which she saved one copy and Hernández Usera another.

"Ramón Aboy, witness for plaintiff, testified that, upon examination of a photostatic copy of the will which Hernández Usera exhibited to him, it seemed that the letters were imprinted with a rubber stamp and also he thought it strange that Encarnación had made such a will. We cannot agree with this witness as to the rubber-stamp effect of the letters in the will. Far from resembling rubber stamps, the letters of the will are distinguishable by their variations. An examination of Aboy's entire testimony discloses that he was as ignorant of the various open wills executed by Encarnación as of the holographic will whose existence seemed strange to him.

"Apart from Ramón Aboy's testimony and the fact of the remittance to plaintiff of a photostatic copy of the will other than that which was protocolized, the only evidence of forgery offered by plaintiff was the testimony of the experts.

"The experts for plaintiff based their conclusion that the will is spurious, on an analysis of both copies of the will and their envelopes, and on a comparison of the handwriting and

signatures of those documents with the ten undisputed specimens of Encarnación's signatures and writings already mentioned.

"For several months prior to the trial plaintiff had access to a large portion of the numberless copies of Encarnación's handwriting and signatures which defendants thereafter offered in evidence. By motion filed February 27, 1950, plaintiff's attorneys requested that a copy of all papers used by the expert for defendants be exhibited to them for comparison with the challenged documents. The evidence shows that the documents were exhibited and photographs taken and sent to the experts for plaintiff. The latter declare that they did not examine those documents or attach any importance to them because their origin, according to them, was suspicious.

"However, among those documents there are undisputed writings of Encarnación Aboy, such as signatures affixed before notaries public, passport applications, and the like.

"The attitude of the experts for plaintiff in abstaining from examining the papers which plaintiff's attorneys themselves insisted on examining and photographing, is most significant.

". . . . . . . . . .

"In the light of author Osborn's observations which, apart from the authority which his prestige imparts to them, seem so wise and reasonable, we find no justification for the refusal of the experts for plaintiff to examine the numerous undisputed models produced by the defendants, many of which were available to plaintiff and his experts for months prior to the trial, and the remainder before commencement of the trial (which lasted two weeks) when they were identified by the defendants at the pre-trial hearing.

"The ten standards utilized by the experts for plaintiff are not, in our opinion, adequate standard writings, either in quantity or quality, which Osborn recommends. Defendants' standard writings which the experts for plaintiff declined to examine, include many specimens of undisputed genuineness which are precisely the adequate standards recommended by Osborn, namely, numerous standard writings coetaneous with the date of the disputed document, including dates several years prior and subsequent thereto, and dozens of Encarnación's genuine signatures. It is to be noted, for example, that among plaintiff's ten standard writings there is not a single one which

contains the complete signature, with the rubric, which, according to the evidence, was used by Encarnación at the time of the execution of the will in dispute, and for years preceding and following that date, that is, 'Encarnación Aboy Vda. de Cintrón.' Defendants' standard writings contain more than thirty of these typical and undisputed signatures.

"The poor quality and insufficient quantity of the standard writings utilized by the experts for plaintiff led them to conclusions which are evidently erroneous in those instances in which they endeavored to point out differences between Encarnación's signatures and writings and the signatures and writings appearing on the challenged documents. For example: plaintiff's experts, in reliance upon Encarnación's few signatures which they used as standards, maintained that she consistently broke the first 'n' in the name Encarnación, in her signature, pointing out that the 'n' was written in a single unbroken stroke in most of the signatures appearing on the disputed documents. They conclude that this divergence in her characteristic way of writing that letter is a sign of forgery. However, examining 29 of Encarnación's signatures written before notaries public dated from 1922 to 1931, which were offered in evidence by defendants and not considered by the experts for plaintiff, we find that the first 'n' is broken in only two of those signatures. It is evident that the error committed by the experts for plaintiff is due to their disposition to reach conclusions on the basis of inadequate standards and to their refusal to consider adequate ones.

"In order that this opinion may not be too lengthy, we shall not take up in detail a number of other errors committed by the experts for plaintiff in pointing out the alleged differences between Encarnación's handwriting and the writing in the questioned documents, differences which are predicated on the insufficiency of the standard writings utilized by them and which vanish upon examining all available standards.

"The testimony of the experts for plaintiff, particularly that of Fernández Ruenes, consists of generalities which throw no light on the issue and speculations more or less ingenuous, but without factual bases to render them valid.

"Aside from the meagerness of the case of plaintiff, who had the burden of proving the alleged forgery of the protocolized document, the evidence for the defense has contributed in a large measure to the conclusion reached by us. It dis-

closes that Encarnación regarded Gloria María Hernández Vázquez and María Vázquez de Hernández as her own daughters, and that these two persons, who are most favored under the disputed will, were precisely the persons expected to be favored by Encarnación under any will which she might execute. It shows the trust which she placed in José Hernández Usera, Gloria's father and María Vázquez' husband. Above all, the standard writings offered in evidence by the defendants and Osborn's testimony comparing those standards with the disputed documents, shed much light on the problem involved herein. As stressed by Osborn, and as indicated by his father in his text *Questioned Documents:* 'It is also reasonable to expect that an imitation will resemble in certain ways the writing imitated and conclusive evidence of genuineness must always be more than this general appearance. When, however, the general appearance is correct and, as pointed out, there are incorporated various delicate qualities of an individual character in a freely written signature, and especially delicate occasional or rare qualities, then the conclusion must be reached that the writing is genuine.'

"Osborn's testimony points out the delicate, and sometimes unusual and occasional, qualities of Encarnación's handwriting which emerge at times in the writing of the wills. The testimony of the experts for plaintiff stresses the same point when pointing out certain strokes and characteristics of the writing in dispute which they were unable to detect in their limited standard writings, and which they did not therefore regard as pertaining to the testatrix, but which, upon examining all standard writings, seem to be either typical or occasional strokes and characteristics of hers.

"There are also in the disputed documents orthographical mistakes and errors of punctuation which are typical of Encarnación's writing.

"Summing up, the bulk of the evidence greatly strengthens the genuineness of the will. Plaintiff's evidence has not convinced us otherwise and, hence, our finding of fact made early in this opinion."

▇▇▇▇ Plaintiff appealed to this Court from the judgment rendered by the San Juan Court assigning several errors. He attacks, essentially, the weighing of the evidence

and of the expert testimony made by the lower court, maintaining that the evidence showed that the contested document was neither written nor signed by Encarnación Aboy widow of Cintrón. We have analyzed in detail the evidence as a whole and find that the will in question was written and signed by Encarnación Aboy widow of Cintrón in her own handwriting, and that it is therefore legitimate and genuine and that the lower court committed no error, wherefore the judgment appealed from must be affirmed.

Weighing the evidence is based on two main elements of judgment, namely, the documents unquestionably written and signed by Encarnación which were offered as standard writings or basis for comparison with the disputed document, and the expert testimony of both parties. It is convenient to lay down a general rule as to the limits of our power of review over those two evidentiary factors. Rule 52 of the Rules of Civil Procedure provides that findings of fact *based on oral testimony* shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. It is evident that the findings based solely on documentary evidence sent up to this Court in its original form, do not come within the scope of Rule 52. Particularly in a case like this, where the decision of the suit depends to a great extent on the writing or character of the handwriting contained in several documents which are before us, we are not bound by the trial court's findings and are in a position to make an original examination of the documents and reach an independent decision on the factual questions, since in such a case we are in just as good a position as the trial court to form a just estimate of the problem at hand. 5 C.J.S. 751, § 1660; *U. S.* v. *Corporation of the President*, 101 F. 2d 156; *Webler* v. *Rosenberg*, 64 N. E. 2d 98; *Berry* v. *Kies*, 22 N. E. 2d 622. The problem presented in *Preston* v. *Peck*, 180 N. E. 671, was whether cer-

tain signatures were genuine, and both the disputed signatures and the admitted standard writings were before the Appellate Court. It was held that the Appellate Court may consider the question independently of the lower court's conclusions thereon.

The reason for the rule that the findings on oral testimony should not be disturbed unless they are clearly erroneous, is predicated on the reality that the trial court is in a better position to observe directly the demeanor, gestures, and reactions of the witnesses. *Ramos* v. *Rosario*, 67 P.R.R. 641. We are therefore dealing with an evanescent and intangible factor which cannot come before us. *Orvis* v. *Higgins*, 180 F. 2d 537, certiorari denied in 340 U. S. 810; *Drew & Co.* v. *Reinhard*, 170 F. 2d 679. However, objectivity prevails in the case of documentary evidence and the fleeting characteristics of the witnesses are irrelevant.

It is interesting to note that our Rule 52 is more specific than its prototype, Rule 52 of the Federal Rules. Federal Rule 52 merely provides that factual findings will not be disturbed unless they are clearly erroneous, but our rule expressly refers to findings of fact *based on oral testimony*. Even under the federal rule, it has been held that it does not apply to documentary evidence. Moore's Federal Practice, 2d ed., Vol. 5, p. 2635, and pp. 2637 *et seq.*, § 52.04, and cases therein cited.

 Regarding the second element of judgment pointed out—expert testimony—there was some conflict in the opinions of both parties' experts, which the lower court settled by giving greater weight, quality, and credibility to the expert for defendant, indicating that the testimony of the experts for plaintiff consisted of speculative generalities. It is the view of a line of authorities that findings of a lower court based on conflicting opinions of expert witnesses may be considered final where the expert testimony is the

only evidence, namely, the exclusive basis for the findings challenged on appeal. 5 C.J.S. 742, § 1657, notes 33 and 34; *Chico Well Drilling Co.* v. *Givens*, 206 Cal. 468, 274 Pac. 966; *Sarakoff* v. *Six Companies*, 59 P. 2d 302. Without passing upon the efficacy or adoption of that rule, we shall not apply it to the instant case because expert testimony was not the only evidence here. The decision of this litigation involves not only an adequate consideration of expert opinions but also a thorough analysis of the documentary evidence on which those opinions rested. Since this Court is called upon to make an original and independent consideration of the documentary evidence, we cannot regard as final, in the sense of not being reviewable by us, the trial court's finding on the preference accorded to the expert opinion for defendants. This notwithstanding, and establishing a balance between the rules above mentioned, we may disturb the lower court's findings on the superior quality of the expert opinion for the defendants, only if an independent examination of the documentary evidence shows that the findings on the expert testimony are clearly erroneous. *Orvis* v. *Higgins, supra.* The postulate established in Rule 52 must apply in particular, with greater justification, in a field where so much depends upon familiarity with scientific principles. *Graver Tank Co.* v. *Linde Air Products Co.* (1950), 339 U. S. 605, 609, 610. In the case at bar, the documentary evidence, independently weighed by us, shows that Encarnación Aboy widow of Cintrón wrote and signed the disputed will. Not only did appellant fail to prove that the findings of the San Juan Court on the expert testimony were clearly erroneous, but, apart from any presumption, we have come to our own conclusion that the will is genuine and that the opinions of the experts for the defendants have greater virtuality and effectiveness than those of plaintiff.

The writing, signatures, and character of the hand-writing in the will coincide with the testatrix's handwriting and undisputed signatures to the extent of foreclosing any possibility of forgery.

In addition to the actual coincidence existing between the testatrix's writing and genuine signature and the writing and signatures in the will, let us consider plaintiff's diverse objections to the genuineness of the will. It is contended that there are divergences of form and style as respects different letters, capitals and small, joining of letters and numbers written in the will, in connection with the true writing of Encarnación Aboy widow of Cintrón, as it appears in the documents submitted in evidence by plaintiff as basis or standards of comparison. The experts for plaintiff referred only to ten documents or standard writings as basis for comparison, namely, two letters written by Encarnación in 1928, contemporaneous with the will, which do not bear her complete signature; four letters written in 1901, 1905, 1906, and 1911, which are too remote in relation to the date of the will, and four letters written in 1938, 1939, and 1940. On the other hand, the defendants produced a greater number of letters and documents, of undisputed genuineness, written and signed by Encarnación. Many of those documents were contemporaneous with the will, or were signed on dates reasonably proximate to that of the will, and bear Encarnación's complete signature. The trial court correctly held that the documents presented as standards by the defendants were more adequate and a better basis for comparison than those presented by plaintiff not only because of their quantity and length, but also because of their contemporaneousness. The figures, signatures, letters, and connections of letters written on those documents of superior quality produced by defendants coincide substantially with the figures, signatures, and letters in the will which have been specifically pointed out by plain-

tiff as being divergent. There is no actual divergence between the will and the documents which serve as more satisfactory standards as to the form and style of the writing. Moreover, even if our analysis were confined to the documents offered as standards by plaintiff, although it is true that there are differences between some specific letters written in the will and the corresponding letters written in such documents, those specific letters are nonetheless written in other parts of the will in a similar (or substantially identical) manner with that written in the documents in question submitted by plaintiff. In other words, the alleged divergence is merely partial and, although it is manifest as to some parts of the will, it is not so as to others. A reasonable explanation for such difference lies in the reality of the natural variations in a person's handwriting, even in the document itself, such variations being unsubstantial in the case at bar. A substantial identity or similarity exists here as to letters and signatures specifically pointed out by plaintiff. This is also true as respects the shading in the letters.

The experts for plaintiff formulated several observations which, in their opinion, prove that the will is spurious. Those observations call for a common explanation, to wit:

(*a*) The letters and words are written by Encarnación with greater speed in her letters than in the will, the letters being written with a "movement of the fingers," while the will is written with a "movement of the hand."

(*b*) The slant of the writing in the letters is greater than in the will.

(*c*) The letters in the will are more compact than in the letters, and the writing style in the letters is smoother and more spontaneous than in the will.

(*d*) The words are broken at the end of the line in the letters presented by plaintiff, while in the will all the words on each line are complete.

(*e*) The signature of Cintrón's widow is written from left to right on the margin of each page or sheet of the will,

instead of from right to left, as would naturally be done by a person spontaneously writing on a document, as alleged by appellant. The inference drawn by appellant is that a forger affixed the signatures in order not to spoil with the perspiration from his hand that which was already written in the document.

The foregoing objections are reasonably explained by the fact that a person, in executing a will, has the tendency to do it carefully, formally, and clearly, and at least with greater care and clarity than in his informal letters, which do not have the importance and transcendence of a will.

The experts for plaintiff alleged that in some places in the will the ink is "run over" or spread out due to fungi or defects in the paper, which goes to prove, as alleged by them, that the document was written on paper which was very old at the time it was written, and that a forger deliberately used old paper to give the impression that the document had been previously written. Such an averment lacks sufficient merit to prove that the will was spurious, particularly in view of the fact that Encarnación could have written the will in 1928, using paper of earlier date.

The experts for plaintiff alleged that the document in dispute is of a legal nature, since it contains legal clauses which were not known to Encarnación. Of course, she could have followed instructions of an attorney in executing the will. Appellant alleges, however, that this allegation is incompatible with the fact that the document contains common orthographical errors, such as *"arvacea"* (executor) instead of *"albacea"*. But even if she followed instructions of an attorney or a pattern furnished by him, such action is compatible with the occasional carelessness of committing errors.

The experts for plaintiff alleged that there are some holes on the margin of the pages of the basic document which, in view of their size and nature, could not have been produced by insects or termites but with a needle or pin, and that

this illustrates that a forger made those holes with a pin or needle to give the impression that the paper was old and that the holes could have been made by insects. Independently of the fact that that argument is incompatible with other arguments of plaintiff (ink run over on old paper), it is possible within reason that Encarnación herself made the holes with a pin or needle for the purpose of putting the pages together.

Appellant argues that a letter dated September 7, 1928 offered in evidence by defendants as written by Encarnación, refers to events occurring subsequent to that date, particularly regarding the children of Gloria Hernández, the legatee, who were born subsequent to September 7, 1928. The reasonable presumption is that this was an error of Encarnación in dating the letter. In any event, such irregularity is no proof that the will was forged.

A circumstance which tends in a great measure to corroborate the genuineness of the will is the fact that the principal legatees or beneficiaries were María Vázquez de Hernández Usera and Gloria Hernández. The evidence showed that Encarnación's affection and love for these ladies was sincere, lasting, and deep-rooted, with preference over other persons. The content of the will is evidence and a consequence of that reality.

Appellant contends that the San Juan Court erred in not permitting him to cross-examine witness José Hernández Usera at the end of his direct examination as witness for the defense. The purpose of the cross-examination was to inquire into the conduct of witness and co-defendant José Hernández Usera, administrator of the testatrix's estate, with respect to certain conveyances or alienations of property made by Encarnación, which, appellant contends, inured to the benefit of Hernández Usera and his wife. In his brief, appellant strives to show that the conduct of witness Hernández Usera with respect to those

conveyances, which plaintiff sought to investigate through the cross-examination, was and is relevant to the basic issue, namely, whether or not the will was forged. We need not pass upon or express an opinion on the question of the relevancy of such evidence on Hernández Usera's conduct regarding the alleged forgery, since the lower court did not allow such cross-examination, not on the ground that it was irrelevant to the cause of action at issue, but on the ground that the cross-examination went beyond the direct examination. The court did not deny plaintiff an opportunity to offer that same evidence thereafter, through a direct examination of Hernández Usera as witness for the plaintiff or through some other evidence, and then decide the question of relevancy. The lower court merely decided correctly that the cross-examination which is the object of this assignment was not related to the facts involved in the direct examination, and that it was not therefore permissible under the provisions of § 155 of the Law of Evidence. Defendants presented Hernández Usera as a witness. On direct examination, he merely testified that Encarnación had delivered the original will to him in the fall of 1928, and that his wife delivered a copy to him thereafter. On cross-examination, plaintiff sought to interrogate the witness on certain conveyances of property made by Encarnación in 1943, during her lifetime, and as to the action taken by him in connection with such property and conveyances. The cross-examination was extraneous and had no relation whatever to the field covered by the examination, and was alien to and lacked logical connection with the questions which arose from the direct examination. The error assigned was not committed.

Appellant argues that the court below erred in ordering plaintiff-appellant to pay the sum of $3,000 for attorney's fees, plus costs, an amount which was in any event excessive. We share the view of the San Juan Court that plaintiff was obstinate in filing the complaint herein, and

that he should therefore be liable for attorney's fees. The sum of $3,000 for attorney's fees was not excessive.

The judgment appealed from will be affirmed.

Mr. Justice Pérez Pimentel and Mr. Justice Belaval did not participate herein.