Harry A. PURSCHE, Appellant,

v.

ATLAS SCRAPER AND ENGINEERING CO., a Corporation, Appellee.

ATLAS SCRAPER AND ENGINEERING CO., a Corporation, Appellant,

v.

Harry A. PURSCHE, Appellee.

Nos. 16410, 16411.

United States Court of Appeals
Ninth Circuit.

Dec. 12, 1961.

Rehearing Denied April 3, 1962.

Lyon & Lyon by Lewis E. Lyon and John B. Young, Los Angeles, Cal., for Pursche.

R. Welton Whann, Robert M. McManigal, Los Angeles, Cal., and James M. Naylor, San Francisco, Cal., for Atlas Scraper & Engineering Co.

Before BARNES, JERTBERG and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

Harry A. Pursche filed a complaint in the district court charging Atlas Scraper and Engineering Co. with infringement of several patents and with unfair competition. He sought an injunction and damages. Atlas answered, denying generally these charges and affirmatively alleged the usual defenses. In addition, Atlas commenced a separate suit seeking a declaratory judgment of noninfringement and invalidity of those patents. The two actions were consolidated and tried to the court sitting without a jury. By a single judgment covering both actions the district court decided the issues for the most part in Pursche's favor. It granted Pursche an injunction and ordered an accounting.[1] The suits are here on Atlas' appeal and Pursche's cross-appeal from the judgment.

Pursche's patents relate to a farm implement known as a "two-way" plow. The specifications of one of the patents states:

"[T]wo-way plows have been found to be superior to the conventional one-way plow in maintaining a level field so that hills and gullies

---

1. The accounting has been held in abeyance pending appeal from the judgment. Jurisdiction of the interlocutory judgment in this patent suit is conferred upon this court by the provisions of 28 U.S.C.A. § 1292 which in pertinent part provides:

"The courts of appeals shall have jurisdiction from:

\* \* \* \* \*

"(4) Judgments in civil action for patent infringement which are final except for accounting." See Patterson-Ballagh Corp. v. Moss, 201 F.2d 403, 408 (9th Cir. 1958).

are avoided and the irrigation of the field is facilitated. One gang of plows is employed while the device is pulled across the field in one direction and when the device is returned parallel to the furrow just completed the other gang of plows is used and accordingly no gully is formed. The usual leveling operations subsequent to plowings are thereby eliminated."

Pursche was not the first to conceive a two-way plow. It was a type of plow known to the art as early as the latter half of the nineteenth century and its many advantages have caused it to be subject of considerable attention on the part of inventors, manufacturers and those engaged in farming. As might be expected, many such plows differing in construction and manner of operation have been designed and built. Some of them have been the subject of letters patent, others have not, but in any event the idea is old and the field is crowded.

Pursche's patents are for improvements. Five of those patents are involved in this litigation, their numbers being respectively: 2,625,090; 2,625,091; 2,625,089; 2,633,786; and 2,659,284. For convenience, each patent will be referred to in the remainder of this opinion by the last three of its numbers.[2]

*090* discloses the basic Pursche invention. Its principal feature, according to the finding of the district court, consists in the combination of "a frame, a longitudinal beam fixed on the frame and extended rearwardly, a plow [share] carrier mounted to turn on the longitudinal beam and provided with right and left-hand plows, and a power developing hydraulic cylinder assembly on the frame acting through a power transmitting connection to revolve the plow carrier in either direction * * *." The 090 plow is supported by a wheel at either side and is pulled behind a tractor.

*091* is essentially similar to the plow of the 090 patent except for the plow

tongue. Both plows possess swinging tongues, but because of differences in construction and location the tongue of the 091 plow reduces the stress that is transmitted to the frame when the plow is towed.

*089* also represents a modification of the 090 plow. The change consists principally in the location of the apparatus that serves to raise and lower the frame of the plow in relation to its side supporting wheels.

*284* possesses no side supporting wheels and consists of the 090 plow converted for mounting directly upon a tractor.

*786* is likewise a tractor mounted plow especially adapted for use on a Ford-Ferguson tractor; this plow is attached to the draft links and control arms with which that tractor is equipped.

Atlas is a long-time manufacturer of farm implements. Prior to 1948 Atlas had never made two-way plows but on April 3rd of that year it secured a license from Pursche, pursuant to a royalty agreement, to use the several inventions described and claimed in his patents and shortly afterwards commenced to manufacture and sell plows embodying those inventions. Atlas terminated the royalty agreement in 1952, but nevertheless continued to make and sell two-way plows hereafter referred to as the B–1, B–5 and "new-style" Atlas plows. The B–1 "new-style" plows, like the plows of the 090, 091 and 089 patents, are tractor drawn and have frames supported by side wheels; the B–5 plow, like the 786 and 284 plow, lacks side wheels and is mounted directly upon the tractor.

The district court, in its judgment, held:

(A) All of the claims of the several patents in suit valid except claim 1 of the 090 which was held invalid.

(B) The Atlas B–5 plow infringed (a) claims 3, 10, 12, 18 and 25 to 27, both inclusive, of the 090 patent; (b) claims 1 to 9 inclusive, and 12 to 15 inclusive,

2. Pursche patent No. 2,655,851 and a plow of Atlas identified as a "B–2", initially involved in these suits were withdrawn from the litigation by the parties during the course of the trial.

of the 786 patent; and (c) claims 3, 8, 10 and 15 of the 284 patent.

(C) The Atlas B–1 plow infringed (a) claims 12 through 16 both inclusive, of the 089 patent; (b) claims 2 through 27 both inclusive, of the 090 patent; and (c) claims 6 to 9 inclusive, and 14, 15 and 22 of the 091 patent.

(D) The Atlas "new style" plow did not infringe any of the claims of 090 (this being the only patent which Pursche asserted was infringed by the "new style" plow).

(E) That Pursche have judgment for unfair competition.

(F) That neither party have its costs.

The issues tendered by the appeal of each of the respective parties will be treated in the following order:

I. The validity of the five Pursche patents:
 a. 090
 b. 786 and 284
 c. 091 and 089

II. The infringment of the Pursche patents by the Atlas plows:
 a. The B–5 and B–1 plows
 b. The "new-style" plows

III. Unfair competition:
 a. Jurisdiction of the district court
 b. Sufficiency of the evidence

IV. Miscellaneous matters:
 a. Joinder of parties
 b. Inequitable conduct
 c. Rulings on evidence
 d. Costs

■ I. "On the major issue of validity we shall first inquire whether the conception for which the patent[s] w[ere] granted involves invention. Because of the lack of a definite rule, questions of this kind are often perplexing.

It is a trite saying that invention defies definition. Yet, through long use, the word has acquired certain characteristics which at least give direction to its meaning. Invention is a concept; a thing evolved from the mind. It is not a revelation of something which exists and was unknown, but is the creation of something which did not exist before, possessing the elements of novelty and utility in kind and measure different from and greater than what the art might expect from its skilled workers." Pyrene Mfg. Co. v. Boyce, et al., 292 F. 480, 481, cert. den. 263 U.S. 723, 44 S.Ct. 231, 68 L.Ed. 525 (1923).

■ a. *The 090 Patent*. The conclusion of the district court that the plow disclosed by the 090 patent was a patentable invention rested upon the factual conclusion that the elements of the plow share carrier rotating device "performs an additional and different function in combination than they perform out of combination." The court particularly found that the component parts collectively "provide a close coupling relationship between the frame, plow carrier and hydraulic cylinder assembly which enables the operator to turn the carrier independently of forward motion and independently of the raising and lowering action and provides quick entry and exit with relation to the land with the result that the space required at the headlands for turn-around is substantially decreased with relation to prior art devices."[3]

Atlas argues that the 090 patent was anticipated by other patents, principally those of Lindeman, Pridgen and Dexheimer. In the Lindeman patent 2,543,-786, the lifting and rotating of the plow share carrier are accomplished by the same device and both operations occur simultaneously when the carrier is raised

---

3. Atlas contends that the following testimony of Pursche demonstrates that the 090 plow carrier cannot be turned without being raised

"I don't believe it [the 090 plow] would turn over unless it was lifted, the way my plow is built."

However, in the course of his further testimony the witness stated in substance that the power cyclinder on the 090 plow would probably not be strong enough to turn the plow shares while they are in the ground but that in any other position the plow carrier can readily be independently turned.

to a substantial height. Thus when the shares are disengaged from the ground, for example to avoid some obstruction in the path of the plow, the carrier revolves, bringing the opposite gang of shares into operation; in order to continue the same furrow it is then necessary for the operator to raise and lower the carrier a second time. In the Pridgen patent 2,227,366 the raising and turning operations are likewise combined. Although in the Dexheimer patent 2,609,-749 the turning of the carrier may be accomplished separate from its raising, the means to accomplish this rotation differ significantly from those employed in the 090 plow in that the Dexheimer apparatus consists of a lever arrangement, "partly automatic" which requires manual manipulation, while the hydraulic cylinder assembly that serves as the means to rotate the Pursche invention is fully automatic. In the Capon patent 2,426,548, although the lifting and the turning of the carrier may be separately achieved, the latter operation cannot be carried out unless the plow is pulled forward for a distance, and our examination of the record discloses no other patent for a device that combines the features of the 090 patent. In sum, the finding that the 090 plow functions in a manner that sets it apart from any device found in the prior art is borne out by the evidence.

Atlas further contends that the assemblage of admittedly old elements forming the subject of the 090 patent claims are mere aggregations and not patentable combinations.

The distinction between an aggregation and a combination and tests to determine into which category a particular device falls is clearly stated by Professor Robinson in his work on Patents:·

"Where operations or instruments are thus united, one of two results must follow. Either each element remains unchanged in function and effect; or by the action of the elements upon each other, or their joint action on their common object, they perform additional functions and accomplish additional effects. The former union is a mere collocation or aggregation of the elements. Although they have been brought together in an apparent organism and rendered more available for use, they still remain the same distinct and independent means, still acting as so many separate units and not co-operating with each other to perform additional functions and accomplish additional results. Such unions, therefore, are not the creation of new means. They do not involve an exercise of the inventive faculties, nor can they be protected by a patent.

\* \* \* \* \* \*

"But when these elements are so united that by their reciprocal influence upon each other, or their joint action on their common object, they perform additional functions and accomplish additional results, the union is a true combination. While every element remains a unit, retaining its own individuality and identity as a complete and operative means, their combination embodies an entirely new idea of means, and thus becomes another unit, whose essential attributes depend on the co-operative union of the elements of which it is composed. Such a combination is a different invention from the elements themselves, whether considered in their separate or their aggregated state, the method of their co-operation in the combination being the result of the inventive act. Whether the elements are new or old, and whether they coact successfully or simultaneously is of no importance. To unite them in a new means by the exercise of inventive skill is invention, and renders the combination, as an entirety, the subject-matter of a patent.

\* \* \* \* \* \*

"This union of elemental instruments or operations in a new operation or instrument must necessarily produce effects beyond the sum of

the effects producible by all the elements in their separated state. This is often the only test by which a combination can be distinguished from an aggregation, and is the one usually applied by the courts. And it is certainly reliable. For since diversity of end necessitates diversity of means, if the new combination accomplishes results that could not have been achieved either by its individual or collective elements, their union must inevitably have brought into action some new or as yet unawakened energy, which constitutes a new and independent means." Vol. 1, Robinson on Patents, sections 154, 155 and 156. (Footnotes omitted.)

■ The distinctive feature in the 090 plow consisting of its ability to bring either of the two sets of plow shares into operative position independent of any other movement is due to the power means consisting of the hydraulic cylinder. A joint or concerted action between the cylinder and carrier occurs when the power means is activated, causing the carrier to rotate; although the joint action continues only during the interval of rotation, yet the combination made by the joint action continues as long as it needs to continue. It is not necessary that the mutual interaction of the elements be constant in order for them to constitute a combination. Lyman Mfg. Co. v. Bassick Mfg. Co., 18 F.2d 29 (6th Cir. 1927); moreover, by reason of this combined action the 090 plow is able, as the trial court found, to perform its work with greatly increased efficiency and be maneuvered in the field much more readily and with greater facility than prior art devices. We conclude that the combination produces a new and useful result —a better means of plowing. Stearns v. Tinker & Rasor, 220 F.2d 49 (9th Cir. 1955).

Nor can we say that the combination was not the subject of a monopoly because the invention was the product of the skill of the mechanic rather than the "intuition of the inventor." National Hollow Brake-Beam Co. v. Interchangeable Brake-Beam Co., 106 F. 693 (8th Cir. 1901). For well over half a century inventors and mechanics had been striving to perfect a practical roll-over plow. In its effort to prove the invention disclosed in the 090 patent was anticipated by the prior art Atlas cited over 90 patents and publications relating to two-way plows; this is in itself cogent proof of the widespread demand for such plows and that considerable effort and attention had been devoted by many persons to improving them. Reynolds v. Whitin Machine Works, 167 F.2d 78 (4th Cir. 1948). Several types that were manufactured were abandoned and there is no evidence that the bulk of the others were ever actually put into production. Atlas marketed a considerable number of plows embodying Pursche's invention during the period the licensing agreement was in effect and since that time International Harvester Co. has discontinued its own efforts to perfect a two-way plow and under license from Pursche manufactured and sold many such plows.

"When the indicia of invention we mention are taken into account together with the true state of the prior art and what the patent in suit accomplished to improve the art, it must be concluded that it represents [patentable] invention." The Coleman Co. v. Holly Mfg. Co., 233 F.2d 71, 80 (9th Cir. 1956).

Atlas next attacks *each of the several claims* of the 090 patent on a number of grounds. In considering them we will follow Atlas' lead and separate the claims into two groups, discussing first what Atlas refers to as the "broad" claims and second, the "narrower" claims.

■ Falling into the first group are claims 1 through 5, 10, 12, 14, 17, 18, 19 and 25 through 27.

Atlas urges that none of the claims in this first group complies with the statutory requirement that a claim must distinctly describe and particularly point out the invention. It appears from the patent that claims 1 through 5, 10, 14,

17, 18, 19, 25 and 26 variously state that the plow is equipped with "means on the frame adapted to turn the carrier" or "power means on the frame adapted to turn the carrier." Such broad and general descriptions apply equally to all mechanisms including the one found in the Capon patent which consists of gears connected to the wheels rather than the hydraulic turning mechanism possessed by 090. The phrase "power means" merely suggests the use of mechanical energy as opposed to manual energy and describes generally the mechanism of both plows.

With one exception all the other parts described in these claims can also be found in the Capon plow. Some of the claims, in addition to the rotating carrier, describe a tail wheel which runs on unplowed ground. The Capon plow did not possess such a wheel. However, the Unterilp patent, another member of the prior art, shows a plow with a wheel on the plow carrier attached like the one on 090.[4] "It is not necessary that all of the elements of the claim be found in one prior patent. If they are all found in different prior patents and no new functional relationship arises from the combination, the claim cannot be sustained." Eagle v. P. & C. Hand Forged Tool Co., 74 F.2d 918, 920 (9th Cir. 1935).

Since no new function nor any surprising or unusual circumstances would arise from placing the Unterilp tail wheel on the plow described in the Capon patent, we conclude that claims 1 to 5, 10, 14, 17, 18, 19, 25 and 26 of the 090 patent are invalid for they merely reiterate what already existed in the prior art.[5]

However, claims 12 and 27 point out specifically that the power means incorporated with the carrier to effect its rotation is a hydraulic cylinder assembly. This detailed description distinguishes these claims from the generality of the others and excludes the Capon and Unterilp plows from their limited scope.[6]

It is next urged that claims 12 and 27 are each invalid for their failure to set out what Atlas deems to be all the essential elements required to constitute 090 an operative machine.[7] We are directed

4. The Unterilp plow is disclosed in a German patent No. 49222 issued in 1889.

5. The district court found that claim 1 of 090 was invalid because of its failure to include the longitudinal beam upon which the plow carrier is mounted to turn.

6. Claim 12 of 090 reads:
"In a two-way plow assembly, the combination of a stationary beam member extending longitudinally in the direction of normal movement of the plow assembly, a carrier turnably mounted on said beam member between the ends thereof and provided with a right hand plow and a left hand plow, a cross member fixed relative to said beam member at a position in advance of said carrier and plows, means including a hydraulic power cylinder carried on the cross member for turning the carrier to bring either plow into operative position, and lift means connected with cross member for lifting the entire length of the beam member and thereby raising the carrier and plows out of ground-engaging position.
Claim 27 of 090 reads:
"In a two-way plow assembly, the combination of: a frame, a stationary longitudinal beam member fixed on and extending rearwardly from the frame, a carrier turnably mounted on the beam member and provided with ground-engaging plow means for producing a right-hand furrow or a left-hand furrow, power means for turning the carrier relative to the beam member including a torque receiving element fixed on the forward end of said carrier, a hydraulic power cylinder assembly mounted on the frame and having a power element movable in a plane normal to said beam member, and means including an intermediate power transmitting element operatively interposed between the power element and the torque receiving element, whereby the power cylinder assembly may turn the carrier in either direction."

7. The following are the twelve parts which Atlas states must be included in order to make an operative construction: (1) a frame, (2) side-supporting wheels, (3) a means for raising and lowering the frame relative to the wheels, (4) a horizontally swingable tongue, (5) a means for shifting the tongue, (6) a longitudinal beam, (7) a carrier, (8) right and left hand plows, (9) a rotating means, (10) a thrust collar, (11) a stop to arrest rotation of carrier, and (12) a rear supporting wheel.

to Goodman v. Super Mold Corp. of California, 103 F.2d 474 (9th Cir. 1939), as authority for the proposition that a claim is invalid unless it teaches the entire machine. We do not so read that case. There the court had under consideration the validity of a number of claims contained in a patent for a machine to retread worn automobile tires. Specifications and drawings of the machine as shown in the patent disclosed the device constituting the purported invention consisting of two rings, one on either side of the tire. These rings served to press the tire against the mold that comprised one of the components of the entire machine. But the claim relating to this particular device omitted from its description one of the two rings. In sustaining the attack that this claim was incomplete within the meaning of 35 U.S.C.A. § 33 (now 35 U.S.C.A. § 112) the court observed that the operation of that particular device "depend[ed] upon the combination with a ring on each side of the tire. The patent d[id] not teach the use of a single ring * * *." That claim was held incomplete not because of its failure to describe the entire retreading machine in which the rings were incorporated, but because of the omission from the claim of one of the essential parts that rendered that particular device functional.[8]

■ It has long been recognized that claims for combinations and also subcombinations may be validly allowed by the patent office (Special Equipment Co. v. Coe, 324 U.S. 370, 377, 65 S.Ct. 741, 89 L.Ed. 1006 (1945) ), and that a claim need not include all the elements necessary to make up a complete operative device. Deering v. Winona Harvester Works, 155 U.S. 286, 302, 15 S.Ct. 118, 39 L.Ed. 153 (1894); Clark Blade and Razor Co. v. Gillette Safety Razor Co., 194 F. 421, 423 (3rd Cir. 1912); Walker on Patents, Vol. 2, sec. 166; Ellis' Patent Claims, sec. 139. The applicable rule is well stated in Ellis' Patent Claims on page 168:

"Every claim need not include all novel elements in the machine. All that is required is that each claim covers a patentable invention. A complete machine may embody numerous inventions, the number of which depends on how many combinations and permutations of elements, each patentable per se, are included in the entire machine. A claim, therefore, need not include elements not essential to the definition of the particular invention that claim is drawn to cover."

The rule and the rationale given by the Supreme Court stated in Deering v. Winona Harvester Works, 155 U.S. at 302 is this, 15 S.Ct. at 124:

"Admitting that additional elements are necessary to render the device operative, it does not necessarily follow that the omission of these elements invalidates the claim, or that the precise elements described in the patent as rendering it operative must be read into the claim. * * * Otherwise the infringer might take the most important part of a new invention and, by changing the method of adapting it to the machine to which it is an improvement, avoid the charge of infringement."

In the instant case, claims 12 and 27 of the 090 patent set out all the necessary parts of a patentable combination.

■■ Nor do any of the remaining attacks on these two claims have merit. Under the doctrine of "late claiming" as exemplified in such cases as Muncie Gear Works v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942), a supplemental claim adding new matter to a pending patent application is invalid where intervening use or sale of a device described in the supplemental claim occurred more than one year prior to the filing of that claim. 35 U.S.C.A. § 102(b). It is true that in this case the 090 plow had been in public use for nearly

---

8. One of the other claims calling for both rings was held valid and infringed.

four years before Pursche supplemented his pending patent application with claim 27. But the scope of the invention stated in several claims initially made in that application extended to and included the matter covered in claim 27. Claim 27 added nothing new to the application.

 Nor is the claim invalid for overclaiming. Pursche is not, as Atlas apparently believes, claiming an improvement to a turning means that is old in the art, but instead is claiming what we have already determined is an entirely new combination that performs a new function over prior art devices. Thus the rule in Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008 (1938) that: " * * * the improvement of one part of an old combination gives no right to claim that improvement in combination with other old parts which perform no new function in the combination" has no application. Rather, the correct principle is the one stated in Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 656, 53 L.Ed. 1034 (1909):

"It is perfectly well settled that a new combination of elements, old in themselves, but which produce a new and useful result, entitles the inventor to the protection of a patent."

The second group of claims which Atlas attacks is comprised of claims 6 to 9, 11, 13, 15, 16, and 20 to 24 of the 090 patent. All these claims except 11, 13 and 15 relate not only to the rotating of the carrier, but also to the lateral shifting of the tongue used to draw the plow. They teach that the carrier is turned and the tongue shifted simultaneously by reason of the interconnection of the respective hydraulic cylinder power means which jointly operate both tongue and carrier.

Atlas urges that even if some "improvement, change or added feature" which might constitute a patentable novelty is present in any claim that, nevertheless such claim indiscriminately includes and comprehends combinations known to the prior art and fails to point out and clearly claim the particular subject of the patent.

Atlas relies on Evans v. Eaton, 7 Wheat. 356, 20 U.S. 356, 5 L.Ed. 472 (1822); there a patentee claimed the whole of a machine called a "hopper boy" employed in the manufacture of flour, although his invention merely related to an improvement of a part of the entire machine. The Supreme Court struck down the claim, saying at page 430:

"If the same combinations existed before, in machines of the same nature, up to a certain point, and the party's invention consists in adding some new machinery, or some improved mode of operation, to the old, the patent should be limited to such improvement, for if it includes the whole machinery, it includes more than his invention, and therefore, cannot be supported."

 But this principle is not applicable for here the patent, although teaching a machine that is made up of parts found by the trial court to be old in the art, combines those parts in a way that results in a substantially new and different machine. The only evidence in the record to the effect that any single prior art device anticipated the interconnecting power means claimed by Pursche consists of this passage appearing in a German patent issued to one Weylmuller in 1941:

"Finally, there is still another known device whereby the unbolting and the rotating of the Grindel and of the plow body chassis are affected by the driving power of the towing motor, and the pulling shaft is shifted as a result of its firm connection with the Grindel which is produced by means of a Cardonic suspension and a chain."[9]

---

9. After searching the briefs, the record and the numerous dictionaries for an explanation of the word "Grindel" we have remained unenlightened as to its meaning.

This casual and vague reference amounting at most to an opinion of the patent officer of a foreign country regarding the operation of some device but lacking any description of its construction cannot be considered substantial evidence on the issue of anticipation.

"An American patent is not anticipated by a prior foreign patent, unless the latter exhibits the invention in such full, clear, and exact terms as to enable any person skilled in the art to practice it without the necessity of making experiments." Carson v. American Smelting & Refining Co., 4 F.2d 463, 465 (9th Cir. 1925).

Similarly, a survey of the entire field demonstrates that Pursche's plow is not a mere aggregation of some or all of the many prior art devices. Dissecting old machines, taking elements from each and verbally constructing the Pursche 090 plow does not aid Atlas for Pursche is not claiming as his invention the individual parts but their new relationship together which achieves what the district court found to be the answer to the need in the two-way plow art.[10]

Atlas argues that claims 11 and 13 of the patent are misdescriptive in that they describe the "lift means" for raising and lowering the plow share carrier as "connected with the cross-member" of the plow frame, whereas the drawings that accompany the patent show the "lift means" are not attached to the cross-members but instead are fastened to the side members of the frame. We think the argument is not only patently tenuous but requires a hypercritical reading of the claims. If by "lift means" Pursche meant the device that serves to raise the carrier rather than the mode of performing the raising and lowering function, nevertheless the "lift means" are attached to the side members of the frame of the plow and these side members in turn are attached to the cross-member designated in the two claims.[11] Although the "lift-

10. In regard to the "narrower claims" our survey of the prior art has included:

UNITED STATES PATENTS

| Number | Name | Date |
| --- | --- | --- |
| 120,572 | Chapman | 1871 |
| 123,330 | Chapman | 1872 |
| 1,189,524 | Baal | 1916 |
| 1,908,095 | York | 1933 |
| 2,187,380 | Kaltoft | 1940 |
| 2,269,502 | Wilson | 1942 |
| 2,316,397 | Briscoe | 1943 |
| 2,327,927 | Orelind | 1943 |
| 2,410,918 | Acton | 1944 |
| 2,426,548 | Capon | 1947 |

FOREIGN PATENTS

| Number | Country | Name | Date |
| --- | --- | --- | --- |
| 49,222 | Germany | Unterilp | 1889 |
| 468,127 | Great Britain | Melotte | 1937 |
| 494,750 | Great Britain | Melotte | 1937 |
| 715,047 | Germany | Weylmuller | 1941 |

UNPATENTED DEVICES

Atlas Scraper Wagon
Improved "Tumblebug" plow

11. 35 U.S.C.A. § 112 in part reads as follows:
"The specification shall contain * * *.
"The specification shall conclude with one or more claims * * *.
"An element in a claim for a combination may be expressed as a means or step for performing a specified function

ing means" are not directly connected to the cross-member they are joined to it by that intermediate connection, and are therefore "connected with the cross member."

 Moreover, as a legal proposition the argument is likewise unsound; every embodiment of an invention need not be described in the specifications nor illustrated by the drawings in a patent so long as the form of the device is not the principle of the invention.

"It is enough if the invention be described together with that mode which is conceived to be the best for putting it into practical use; and where that has been done, the patent is not confined to the precise mode outlined." Chicago Pneumatic Tool Co. v. Hughes Tool Co., 97 F.2d 945, 946 (10th Cir. 1938); see also, Cameron Iron Works v. Stekoll, 242 F.2d 17, 20 (5th Cir. 1957).

Conversely stated, the claims need not set out the exact same structures as are shown in the drawing or described in the specifications so long as the differences between them do not encompass the invention itself.

The essential features of the invention are stated whether the "lifting means" is directly or remotely connected to the cross-member.

 I. b. *The 786 and 284 patents.* Atlas attacks both the 786 and 284 patents on numerous grounds, the first being that they violate the rule against double patenting.[12]

The district court found that the elements comprising the plowing assembly of the 784 and 284 plows as well as the 090 plow patents are essentially the same and are embraced in the claims of all three patents but nevertheless concluded that what was claimed in both 786 and 284 was patentable invention.[13] The inventive feature in the 786 patent was found to exist in the "hitch mounting for a 'Ford-Ferguson' type tractor with power draft links and * * * construction wherein the weight of the two-way plow assembly is effective to assist in turning the plow carrier on the longitudinal beam of the frame" while in the 284 patent the district court concluded that the invention lay in the "direct mounting connection for a two-way plow for support on the rear of a tractor, the support means on the plow being mounted at opposed ends of a cross-member of the frame, thereby producing a close-coupling connection to minimize rearward extension of the parts of the plow and thereby minimize 'bucking' or undesirable lifting of the front end of the tractor."

Pursche concedes that claims 12 and 27 of the 090 patent read squarely on the disclosures contained both in the 786 and the 284 patents, but he points out that the plows in the latter two patents are tractor mounted rather than wheel supported; he also notes that because of this difference the claims in the latter two patents on which 090 reads include means for attaching the plows to tractors which the 090 patent does not possess and he argues that since the claims of 786

without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

12. " * * * two valid patents for the same invention cannot be granted either to the same or to a different party." Miller v. Eagle Co., 151 U.S. 186 at 197, 14 S.Ct. 310, 314, 38 L.Ed. 121 (1893).

13. Finding 12 reads in part:
"Each of the two-way plows constructed by the party Harry A. Pursche and

as shown in the drawings of Patent Nos. * * * 090, * * * 786 and * * * 284 included a frame having a longitudinal beam, a carrier mounted to turn on the beam, right and left hand plows hydraulic 180° apart on the carrier, and hydraulic power beams mounted transversely on the frame adjacent the forward end of the carrier for turning the carrier on the longitudinal beam to bring either of the plows into operative position. Each plow device also included a thrust collar mounted at the rear end of the longitudinal beam for applying draft force to the carrier. * * *"

and 284 do not read on 090 they must be held valid.

It is true that some of the elements making up the combinations claimed in 284 and 786 are not present in the claims of 090. Nevertheless, this does not necessarily conclude the issue; " * * * mutual cross reading of the claims of an application and patent may be a factor in determining whether double patenting exists; but it is not indispensable to a holding of double patenting. * * * It is axiomatic that if two patents are to be granted there must be two inventions present." Application of Ward, 236 F.2d 428 at 432 (43 CCPA 1956, 1007).

In the case at hand the claims of 786 and 284 patents embrace the actual plowing assembly which was the subject of the claims of the 090 patent plus the means by which the plowing assembly is attached to the towing vehicle. However, members of the prior art similarly attached their plowing assemblies directly to the rear of the tractors and clearly anticipate the means for doing so claimed in the 786 and 284 patents.[14] When this is added to the fact that Pursche had already received protection for his assembly of parts which actually perform the plowing, the conclusion that 786 and 284 are not inventive, becomes inescapable. Application of Asseff, 173 F.2d 253 (36 CCPA 1949, 867); Oliver-Sherwood Co. v. Patterson-Ballagh Corp., 95 F.2d 70, 78 (9th Cir. 1938).

We are, of course, aware that the applications for the 786 and 284 patents were co-pending with, but issued several months later than, the 090 patent, and that while co-pending applications " * * are not technical references in the sense that a timely granted patent to a third person might have been, it is * * * perfectly proper to look to them for what they claim, and when two applications are presented to by an inventor it is proper 'to hold the one unpatentable in view of the prior art and the claims upon which

the other was patented.'" In Re Mason, 62 F.2d 185, 187 (20 CCPA 1932, 782).

Nor is the turning of the carrier through the use of its own weight (as claimed in 786) or the minimization of the bucking of the tractor by the relocation of the plowing assembly (as claimed in 284) such an unusual or surprising consequence as to elevate the aggregation of old elements to the level of patentable invention. Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

This conclusion makes it unnecessary to discuss any of the Atlas remaining points regarding these two patents.

I. c. *Patents 091 and 089.* The district court held that claims 6 to 9 inclusive, 14, 15 and 22 of the 091 patent and claims 12 to 16 inclusive of the 089 patent were valid. But Atlas argues that both patents violated the rule against double patenting as expressed in McCreary v. Pennsylvania Canal Co., 141 U.S. 459, 467, 12 S.Ct. 40, 43, 35 L.Ed. 817 (1891):

> "It is true that the combination of the earlier patent in this case is substantially contained in the later. If it be identical with it, or only a colorable variation from it, the second patent would be void as a patentee cannot take out two patents for the same invention."

> "The rule against double patenting is based upon the idea that the power to create a monopoly is exhausted by the first patent, and that a new and later patent * * * would operate to extend or prolong the monopoly beyond the period allowed by law." J. R. Clark Company et al. v. Jones & Laughlin Steel Corp., 288 F.2d 279, 281 (7th Cir. 1961).

Illustrative of situations where this rule is applied are Miller v. Eagle Mfg. Co., 151 U.S. 186, 14 S.Ct. 310, 38 L. Ed. 121 (1894) and Weatherhead Co.

---

14. The Ferguson patent, No. 2,223,002; the Lindeman patent, No. 2,543,786; and the Dexheimer patent, No. 2,609,740.

v. Drillmaster Supply Co., 227 F.2d 98 (7th Cir. 1955). In both those cases a second patent issued for essentially the same invention was held void. In each instance the facts as set out in the opinions disclosed that the patent struck down had been issued several months after the first; to uphold the second patent as valid would have unduly extended the patentee's monopoly. But the facts in the instant case are significantly different from those in Miller and Weatherhead.

 Patents 090, 091 and 089, their applications being filed in that chronological order, were all issued to Pursche on the same date—January 13, 1953 and they both refer to 090 and expressly state that they extend to "improvements" on the invention embodied in 090.[15] Unless void because they violate the rule, the two later filed patents will expire at the same time as the 090. There would be no extension of the patent monopoly. The decisions on this point are to the effect that the rule will not operate where the reason for its application is absent. A typical statement appears in Theroz Co. v. United States Ind. Chemical Co., Inc., 14 F.2d 629, 640 (D.C.Md.1926), aff'd 25 F.2d 387:

> "Since the patentee is the same in both instances, the second * * * patent is not invalidated by the application for the first. Deister Concentrator Co. v. Deister Machine Co., (C.C.A.) 263 F. [706,] 710. It is true in the case at bar, as in the case cited, that, although the claims in the second patent might have been joined with the claims of the first, no damage to the public resulted from their separate presentation, in view of their simultaneous issuance, and it is quite clear that no fraud was practiced or intended by the applicant." See also, J. R. Clark Co. v. Jones & Laughlin Steel Corp., supra.

We agree with the statement last quoted and find it applicable here. We conclude that claims 6 to 9, 14, 15 and 22 of the 091 patent, and claims 12 to 16 inclusive of the 089 patent are valid.[16]

II. The infringement of the Pursche patents by Atlas plows:

a. *The B–5 and B–1 plows.* The district court, as previously mentioned, held Pursche's patents valid and concluded Atlas' B–1 and B–5 plows infringed them; except as to several claims of Pursche's patent, which were held to be infringed by the B–5 plow, Atlas did not specify the court's rulings as errors. Rather, Atlas urged on appeal that the Pursche patents were invalid and sought on that basis to avoid liability on the doctrine that there can be no infringement of an invalid patent. Hoover Co. v. Mitchell Mfg. Co., 269 F.2d 795 (7th Cir. 1959); Bergman v. Aluminum Lock Shingle Corp., 251 F.2d 801 (9th Cir. 1958). It follows that so far as we have concluded the claims of the Pursche patents were valid, Atlas has conceded their infringement by his B–1 and B–5 plows; the only matter presented to us is whether the B–5 plow infringes the 786 patent; but this requires no discussion since we have held that the 786 patent was anticipated by the prior art and cannot stand.

---

15. In the first paragraph of the specifications of the 091 patent Pursche said:
"This invention relates to a two-way plow and is particularly directed to improvements over the construction disclosed in my co-pending application * * * [for patent 090]."
In the corresponding paragraph in the 089 patent he likewise said:
"This invention relates to agricultural implements and is particularly directed to improvements in a two-way plow. The present invention relates generally to the type of plows illustrated in my co-pending applications * * * [091] filed July 14, 1947 and * * * [089] filed July 17, 1947."

16. Atlas has attacked these claims with the same arguments which he used against the "narrow" claims of 090, namely, that they are anticipated by the prior art, are mere aggregations, and that they overclaim their inventions. However, what we said in sustaining the validity of the "narrow" claims of 090 applies equally here.

b. *The Atlas "new style" plow.* The question considered under this heading is whether the "new style" plow infringed Pursche's 090 patent and is tendered by Pursche's cross-appeal.

The term "new style" plow refers to four plows manufactured by Atlas and designated in the record as its "B–3, B–4, B–6 and B–7" models. These four plows possessed common characteristics, were constructed substantially alike, and are referred to by the parties as the Atlas "new style" plow. For convenience, we too will adopt that designation.[17]

The district court held the "new style" plow did not infringe the 090 patent; its conclusion was predicated upon the finding that the "new style" plow " * * works differently [from the plow in the 090 patent], particularly with the two wheels riding on the unplowed ground and particularly with the eccentric mounting of the plows." We conclude that this finding is supported by substantial evidence.[18] Graver Tank & Mfg. Co. v. Linde, 339 U.S. 605, 609, 610, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Moon v. Cabot Shops, Inc., 270 F.2d 539 (9th Cir. 1959).

Atlas concedes that the claims of the 090 plow read on the "new style" plow, but this is not conclusive on the question of infringement. "Infringement is not a mere matter of words." Grant v. Koppl, 99 F.2d 106, 110 (9th Cir. 1938). In order to constitute infringement there must also exist substantial identity of function, means, and result. Martin v. Ford Alexander Corp., 160 F.Supp. 670 (D.C.S.D.Calif.1958). The turning of the carrier in the respective plows is effected in the same manner and to that extent plows are similar in their mode of operation, but nevertheless, the mechanical construction of the car-riers of the two plows differs in material respects. All the shares on the Pursche plow are located within the track of the side supporting wheels of the frame, while in the "new style" plow the far-thermost share of the several comprising each gang of plows extends beyond the outer side of either wheel. The shares in both machines lie to the rear of the wheels. Thus, when the plows operate, one wheel of the 090 plow runs in plowed ground and the other rests on unplowed ground whereas both wheels of the "new style" plow travel on unplowed ground. According to the expert witnesses substantial advantages resulted to the "new style" plow because of this difference: the "new style" plow is able to obtain full furrow depth on the first run but the Pursche plow requires three to five passes to do so; the Atlas plow runs evenly whereas in the Pursche plow unevenness frequently occurs due to clods of earth falling into the furrow in which the wheel is traveling; the Atlas plow can readily straighten the furrow but since the wheel of the Pursche plow "tracks" in the furrow this operation in the latter plow might require "fifteen to twenty rounds to get that field straightened out again. It is a very difficult problem."

The district judge, in his role of fact-finder, had the two plows before him and at a demonstration observed them in operation; he was in much better position that we to determine whether the testimony was borne out and we cannot conclude that his conclusion was errone-ous.

## III. *Unfair Competition.*

Atlas attacks the judgment of the district court determining it was guilty of unfair competition. It urges two grounds for reversal: (a) lack of juris-diction of the district court over the

---

17. There is another Atlas plow known as the B–2 model, but this was withdrawn from the litigation by stipulation of the parties.

18. We are aware that a patent was grant-ed for the combination comprising the "new style" plow, but we put that fact aside. Although the granting of a pat-ent carries with it a presumption that the invention claimed there is patentable there is no presumption that the invention does not infringe an earlier issued patent. Jonas v. Roberti, 7 F.2d 563 (9th Cir. 1925); Bake-Rite Mfg. Co. v. Tomlin-son, 16 F.2d 566 (9th Cir. 1926).

subject matter, and (b) insufficiency of the evidence to support the judgment.

a. Both parties are citizens and residents of the State of California and therefore jurisdiction of the district court to entertain the claim must be rested (if it existed at all) on 28 U.S.C.A. § 1338(b). That subsection provides:

> "The district court shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trademark laws."

Atlas argues first that the claim in question is not one of unfair competition and second that it is not "related" to the claim for the alleged infringement as required by the statute. The contention advanced is that unfair competition is a tort consisting of the violation of a duty rather than the breach of a consensual agreement; that the gist of Pursche's claim is Atlas' breach of promise contained in the royalty license agreement rather than the omission of any duty with the result that the dependent claim does not constitute the tort of "unfair competition." However, the gravamen of Pursche's dependent claim is not Atlas' breach of contract, but rather the activity that followed the breach, more specifically, the utilization and sale of devices which Atlas was able to manufacture because of the knowledge it had received from Pursche's confidential disclosures and from the improvements to which Pursche was allegedly entitled under the licensing agreement.

The Supreme Court in A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495 at page 531, 55 S.Ct. 837, 844, 79 L.Ed. 1570 (1935), recognized that: " 'Unfair competition,' as known to the common law, is a limited concept. Primarily, and strictly, it relates to the palming off of one's goods as those of a rival trader. \* \* \* In recent years, its scope has been extended. It has been held to apply to misappropriation as well as misrepresentation, to the selling of another's goods as one's own,—to misappropriation of what equitably belongs to a competitor. \* \* \* Unfairness in competition has been predicated of acts which lie outside the ordinary course of business and are tainted by fraud, or coercion, or conduct otherwise prohibited by law."

■ Atlas' right to manufacture and sell plows embodying Pursche's inventions and improvements ceased upon the termination of the licensing agreement. If Atlas thereafter continued to make use of Pursche's property in its business, this constituted unfair competition within the meaning of section 1338(b). Schreyer v. Casco Products Corp., 190 F.2d 921 (2d Cir. 1951).[19]

On the issue of lack of jurisdiction Atlas further argues that the facts on which the claims of infringement and unfair competition are grounded are not the same and that therefore 28 U.S.C.A. § 1338(b) cannot operate to permit the joinder of the two claims.

■ There is some conflict among the circuits over the construction of the phrase, "related claim" appearing in this statute; some require that "both the federal and non-federal causes rest on substantially identical facts," (Powder Power Tool Corp. v. Power Actuated Tool Co., 230 F.2d 409, 413 (7th Cir. 1956); Landstrom v. Thorpe, 189 F.2d 46 at 51 (8th Cir. 1951)) while others are satisfied if there exists a "considerable overlap in their factual basis" and if a substantial amount of the evidence of one claim be relevant to the other. Maternally Yours v. Your Maternity Shop, 234 F.2d 538 at 544 (2d Cir. 1956); Lyon v. Quality Courts United, 249 F.2d 790 at 795 (6th Cir. 1957); see also, Moore's

---

19. We do not reach the question whether a breach of contract can also be unfair competition. But see, Telechron, Inc. v. Parissi, 197 F.2d 757 (2d Cir. 1952); and Judge Clarke's dissenting opinion in Kleinman v. Betty Dain Creations, 189 F.2d 546 (2d Cir. 1951).

Federal Practice, Vol. 1, pages 658 to 659.[20]

"In construing the sections of title 28 weight should be given to the reviser's notes which were included in the committee reports when the legislation was before Congress. [Citations omitted.] The reviser's note to § 1338 states:

"Subsection (b) is added and is intended to avoid 'piecemeal' litigation to enforce common-law and statutory copyright, patent and trademark rights by specifically permitting such enforcement in a single civil action in the district court." [21] Stauffer v. Exley, 184 F.2d 962 at 964 (9th Cir. 1950).

█ We conclude that the more liberal construction of this statute exemplified by the Maternally Yours and Lyon decisions better serves to attain the legislative purpose than the more restrictive construction reflected in Landstrom v. Thorpe, supra, and that the instant case is of the type to which section 1338 (b) applies. Unlike Dubil v. Rayford Camp & Co., 184 F.2d 899 (9th Cir. 1950), where the operative facts were found to be "very different" the claims of infringement and unfair competition in the instant case have a common background with much of the evidence being pertinent to both.

█ III. b. We turn next to questions concerning the sufficiency of the evidence to support the findings of the trial court that Atlas competed unfairly with Pursche.

The licensing agreement contained, among others, the provision that to the extent of Atlas' interest therein, all improvements, modifications and betterments to Pursche's inventions which Atlas conceded were acquired while the agreement was in force, belonged to Pursche; it further provided that Atlas should promptly disclose and transfer by proper assignment all such inventions to Pursche.

The essence of the claim of unfair competition is Atlas' wrongful concealment of information concerning improvements made to the Pursche plows by its employee, Roy L. Chandler.

Chandler was orally hired by Atlas in November 1950 and continued in that employment for nearly six years. During this period he filed applications for patents embodying three inventions relating to two-way plows and joined with one Claude B. Ogle Jr. in applying for a fourth. Thus on May 29, 1952, Chandler applied for a patent for a gear type device to turn the plow share carrier on the longitudinal beam; in 1953 he applied for patents covering two more inventions, both consisting of new types of tail wheels referred to as the "butterfly tail wheel" and the "chain type tail wheel." In 1954 Chandler and Ogle jointly sought a patent for a plow which incorporated the gear-type turning device of his former application.[22]

Pursche's claim of unfair competition has merit only if Atlas was entitled to the improvements and betterments reflected in those patents. This, in turn, dependent on the terms of Chandler's employment by Atlas. If Chandler was hired for the express purpose of originating for his employer's benefit, inventions relating to two-way plows, then Atlas was entitled to any such invention. Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560 (1923). Similarly, if though not initially employed for the purpose of exercising his inventive ability for his employer, Chandler nevertheless was thereafter directed to devote his talents to that end, then the product of his later efforts likewise was the property of Atlas. Forberg v. Servel,

20. The Second and Sixth Circuits once followed the stricter view. See Kleinman v. Betty Dain Creations, Inc., supra, and French Renovating Co. v. Ray Renovating Co., 170 F.2d 945, 947 (6th Cir. 1948).

21. See Judge Clarke's dissent in Kleinman

v. Betty Dain Creations, Inc., supra, at page 551, of 189 F.2d fn. 6.

22. Patents for these inventions were thereafter issued, their respective numbers being 2,817,241; 2,842,038; 2,773,-439; and 2,830,519.

Inc., 88 F.Supp. 503 (D.C.S.D.N.Y.1949). Conversely, if Chandler's employment was general then Atlas was not entitled to his inventions but at most acquired a shop right or license to use as distinguished from the ownership or right to ownership of the inventions.[23] And since a "shop-right" is personal to the employer and cannot be the subject of transfer to another (Hapgood v. Hewitt, 119 U.S. 226, 7 S.Ct. 193, 30 L.Ed. 369 (1886)), no right of Atlas to the invention could pass to Pursche by virtue of the licensing agreement.

The district court found that the two tail wheels in the gear type roll-over mechanism disclosed and described in the several Chandler patents "were improvements, modifications and betterments upon the Pursche plows and were made or conceived within the terms of the license agreement · * * * and were made within the provision of said agreement and through the efforts and under the control of the party Atlas * * * and its employee, Roy L. Chandler." It further found that "said inventions, improvements, modifications and betterments of Roy L. Chandler were made in the course of his employment as an engineer and designer while working on projects assigned to him by the management of the party Atlas. * * * And that * * * Atlas concealed from the party Harry A. Pursche development activities of its employee Roy L. Chandler in two-way plows." On the basis of these findings the district court concluded that the concealment of the improvements made by Chandler and their continued use by Atlas "did and does constitute unfair competition as to the party Harry A. Pursche."

Atlas makes a dual attack on the court's findings; first, it vigorously argues that all the evidence was to the effect that Chandler was hired by Atlas as a detail draftsman under a general contract of employment and not as an engineer and designer and that at no time pertinent to the development of his inventions was Chandler directed or commissioned by Atlas to make any improvements to two-way plows for Atlas' benefit. Secondly, Atlas contends that regardless of the nature of Chandler's employment and contrary to the court's finding that all three of the devices whose use by Atlas was held to constitute unfair competition, the evidence conclusively demonstrates that two of those inventions were made and conceived long after the licensing agreement was terminated.

Atlas makes a persuasive argument. The court's findings were contrary to the direct testimony on the subject, but this evidence was all adduced from interested witnesses and was countered by substantial mute evidence from which the facts found by the trial court can be inferred. We are not convinced that the several findings of the district court are "clearly erroneous" as that term is defined in the much cited case of United States v. United States Gypsum Co., 333 U.S. 364 at 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

IV. Miscellaneous matters:

 a. *Joinder of parties.* Atlas next asserts that the district court injunction prohibiting Atlas from competing unfairly with Pursche by using the Chandler patents has deprived Chandler of property in violation of the due process clause of the federal constitution. Chandler was not named as a party to either of these suits but it appeared during the trial that shortly before that time he had granted Atlas an exclusive license on a royalty basis to practice his three inventions; no royalties will accrue to

---

23. " * * * the so-called shop-right * * * shortly stated, is that where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master, a nonexclusive right to practice the invention." United States v. Dubilier Condenser Corp., 289 U.S. 178, at 188, 53 S.Ct. 554, 558, 77 L. Ed. 1114 (1932). See also, Consolidated-Vultee Aircraft Corp. v. Garbell, 204 F. 2d 946 (9th Cir. 1953).

Chandler unless Atlas uses those inventions.

Atlas does not elaborate upon its argument nor refer us to any statute or case law relating to a situation of this sort but from the statements appearing in its brief we construe the contention to be that Chandler was an indispensable party to the litigation.[24] See 41 Yale Law Journal 1241 at 1242.

In State of Washington v. United States, 87 F.2d 421, 427 (9th Cir. 1936), this court declared that a person not party to the suit who was interested in the controversy and whose interest was such that a decree could not be made without adversely affecting that interest, was an indispensable party; it also stated that the non-joinder of an indispensable party is a fatal error and the court cannot proceed to a decree in the absence of such indispensable party. It follows as a necesary corollary that a decree entered by the district court in the absence of an indispensable party must be set aside on appeal. McShan v. Sherrill, 283 F.2d 462 (9th Cir. 1960).

But we are of the opinion that Chandler had no interest in the controversy requiring his joinder as a party. The injunction was directed against Atlas to prevent conduct that was tortious because it violated a duty arising from an agreement entered into between Pursche and Atlas; Chandler was not party to that agreement, gained no rights through it nor did the decree upon which the injunction issued adjudicate any right of Chandler derived from his own separate agreement with Atlas.

Ordinarily where the rights involved in litigation arise upon a contract, courts refuse to adjudicate the rights of some of the parties to the contract if the others are not before it. Shields v. Barrow, 17 How. 129, 140, 58 U.S. 129, 15 L.Ed. 158; Carroll v. New York Life Ins. Co., 8 Cir., 94 F.2d 333; cf. Waterman v. Canal-Louisiana Bank Co., 215 U.S. 33, 48, 30

S.Ct. 10, 54 L.Ed. 80. Such a judgment or decree would be futile, if rendered, since the contract rights asserted by those present in the litigation could neither be defined, aided nor enforced by a decree which did not bind those not present.

"But different considerations may apply even in private litigation where the rights asserted arise independently of any contract which an adverse party may have made with another, not a party to the suit, even though their assertion may affect the liability of the former to fulfill his contract. The rights asserted in the suit and those arising upon the contract are distinct and separate so that the court may, in a proper case, proceed to judgment without joining other parties to the contract, shaping its decree in such manner as to preserve the rights of those not before it." National Licorice Co. v. N. L. R. B., 309 U.S. 350, 363, 60 S.Ct. 569, 577, 84 L.Ed. 799 (1940).

IV. b. *Inequitable conduct.* The next error asserted by Atlas concerns the refusal of the trial court to withhold all relief from Pursche on the ground that he was guilty of inequitable conduct.

The doctrine crystalized in the familiar equitable maxim that "he who comes into equity must come with clean hands" is often invoked by litigants as a defense and sometimes applied by the courts as a bar in actions involving the validity or infringement of patents. Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381. Seismograph Service Corp. v. Offshore Raydist Inc., 263 F.2d 5 (5th Cir. 1959). But we fail to perceive any basis for its use here. It appears that during a visit to the Atlas factory Pursche observed on one of the two-way plows the then unpatented

24. The objection to the trial proceeding without Chandler was not made in the trial court but was raised the first time on appeal; but nevertheless Atlas may still urge the matter. McShan v. Sherrill, 283 F.2d 462 (9th Cir. 1960).

device referred to earlier in this opinion as the "butterfly type tail wheel." Shortly afterward he filed an application for a patent for the device. This precipitated an interference proceeding in the Patent Office when Chandler also filed an application claiming the same invention. Pursche made no appearance at the hearing and Chandler was ultimately granted the patent although after some delay due to the interference.

These facts fall far short of proving either that Pursche was attempting to pirate another's invention or that he deliberately misrepresented himself to be the inventor to the officials of the Patent Office in order to gain the monopoly, or that he was guilty of any other misconduct in relation to the patent for the "butterfly type tail wheel" or "anything [else] involved in the suit." Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S.Ct. 146, 148, 78 L.Ed. 293 (1933).

The Pursche-Atlas licensing agreement was in effect at the time; there is nothing to indicate Pursche surreptitiously gained access to the plant or that he believed the invention had been originated by someone other than himself. On the contrary, Pursche gave testimony which the district court could well have credited to the effect he was in fact the inventor of the tail wheel and had disclosed its salient features to Atlas long before the latter embodied it in a two-way plow.

IV. c. *Rulings on evidence.* Atlas' four final assignments of error relate to the admission and exclusion of evidence.

1. During cross-examination of Atlas' witness Lundie, the court admitted, over Atlas' objection, an exhibit consisting of a written statement by the witness to the effect that (a) he had been an employee of Atlas while the Pursche-Atlas licensing agreement was in force, and (b) on one occasion during that period an officer of Atlas caused him to move a partially completed "two-way" plow embodying one of Chandler's inventions, out of the shop so that Pursche would not see it. Atlas contends that admission of this document was error and that on it rested the sole support for the court's finding in connection with Pursche's claim of unfair competition that Atlas deliberately concealed from him "its development activities" in "two-way" plows.

■■■■ The court should have sustained Atlas' objection. It appears that the exhibit was admitted for the purpose of discrediting the witness for the court, in ruling on counsel's objection, made the observation that "it is proper cross-examination to show his interest and bias" and also commented that "the latter part [of the statement] is the part which would show his interest and bias." However, the statements were not impeaching; nothing contained in the latter part would even remotely tend to establish any partisanship of the witness in favor of Atlas or prejudice against Pursche or facts from which an improper motive could be inferred.[25] But this admission of the exhibit, although error, does not necessitate a reversal of the judgment. If our interpretation of the court's comments is correct then presumptively the statements appearing in the exhibit were considered solely to lessen the credibility of the witness, not to establish the truth of their subject matter. But even if the admission of the exhibit was general pursuant to its offer by counsel "for the purpose of showing the facts stated in the letter and also for the purpose of showing the intent of the party and his connection with this matter" the conclusion must be the same. There was other competent evidence in the record tending to prove Atlas' misconduct as reflected in the finding. Ordinarily the admission of incompetent evidence over objection will not be grounds for reversal when the case is tried to the court sitting without a jury and there is competent evidence to support the find-

25. The exhibit could not have been used as a prior inconsistent statement to impeach the witness, for his direct examination had not extended to the matter referred to in the exhibit.

ings since the presumption is that the judge disregarded the incompetent and relied upon the competent evidence. Erceg v. Fairbanks Exploration Co., 95 F.2d 850 (9th Cir. 1938); United States v. National Bank of Commerce, 73 F.2d 721 (9th Cir. 1934).

■ Atlas next assails the action of the district court with respect to the depositions of Pursche. Atlas had taken Pursche's testimony pursuant to Fed. Rules Civ.Proc., Rule 26, 28 U.S.C.A. in connection with its discovery and at the trial offered the depositions en masse as original evidence. But the court refused their admission. It does not appear that the depositions were irregularly taken or that the court rejected them because they were lengthy and no doubt contained much that was repetitious, extraneous or otherwise inadmissible. Rather, it appears the court was of the opinion that since Pursche was present Atlas was required to call him as a witness and could not use his deposition to prove any fact or facts therein stated. This conclusion is manifest for in ruling, the court flatly said: "You are not entitled to have the depositions introduced if the witness is here except for impeaching purposes." [26] This was error. The use of depositions is regulated by Rule 26 (b); subsection one permits "any party" to use a deposition to impeach the deponent as a witness, while subsection three permits "any party" to use the deposition of any person as primary proof of the facts stated there provided the deponent is first shown to be unavailable as a witness; but subsection two permits "an adverse party" to use the deposition of

"a party * * * for any purpose" and imposes no preliminary conditions to this use of the testimony. This is but a tacit way of saying that the deposition can be used as original evidence regardless of the presence or absence of the deponent. Pfotzer v. Aqua Systems, Inc., 162 F.2d 779 (2d Cir. 1947); Merchants Motor Freight, Inc. v. Downing, 227 F.2d 247 (8th Cir. 1955); 4 Moore Fed.Prac. p. 1190.

 We do not mean to sanction the practice of indiscriminately offering an entire deposition or encourage any attempt to thus impose upon the court. In Merchants Motor Freight v. Downing, supra, the court stated the deposition of a party might be admitted "subject to the court's right to exclude such parts thereof as might be unnecessarily repetitious in relation to the witness' testimony on the stand." No doubt that procedure has merit but we believe as a general rule the better practice is for the court in the first instance to require counsel to specify the particular portions that are deemed relevant and to limit the offer accordingly. Cf. United States v. United Shoe Machinery Corp., 93 F.Supp. 190 (D.C.D.Mass.1950).

But the record does not demonstrate that the error was prejudicial. On three occasions Atlas examined Pursche as an adverse party pursuant to Rule 43(b); the examination covered many matters involved in the action and was not limited by the court; the last of Pursche's appearances followed Atlas' unsuccessful attempt to introduce his depositions. Atlas then interrogated Pursche, covering various matters appearing in the dep-

---

26. The rationale of the district court also appears in the record:

"I do not think it is proper to use the depositions when the witnesses are before the court because you are introducing a piece of paper, and part of the function of the trial judge is to weigh the evidence and you cannot weigh it when it is on a piece of paper. You can weigh it when it comes live from the mouths of witnesses."

This statement reflects the historic legal view expressed in statutes such as

Revised Statute § 865 (2nd ed. 1878), 28 U.S.C.A. § 641 (1934), that "on the trial itself the adducing of facts by viva voce testimony of witnesses * * * whose demeanor and manner are subject to the observation of the judge or jury * * * is superior to the use of written statements of the same witness." The New Federal Deposition & Discovery Procedure, 38 Col.L.Rev. 1436 at 1443 (1938).

osition and his testimony concerning them, and at no time did Atlas offer to prove that Pursche's testimony at the trial fell short of any appearing in the depositions. 28 U.S.C.A. § 2111; McKee v. Jamestown Baking Co., 198 F.2d 551 (3 Cir. 1952); Watts v. Holland, 153 F.2d 337 (9th Cir. 1946); Davis v. R. K. O. Radio Pictures, 191 F.2d 901 (8th Cir. 1951).

Atlas' next point concerns the refusal of the district court to admit into evidence certain motion pictures covering a long interval during one of the two field demonstrations at which the court observed in operation several of the Atlas and Pursche plows. There was no error in this ruling. Both parties adduced testimony in considerable detail describing both the construction and the mode of operation of their plows and in addition some 46 still pictures taken at the demonstration were admitted in evidence. The proposed exhibit was cumulative of the evidence and in its rejecting the court acted without its discretion.

Atlas' final point that a telegram admitted by the district court over objection that its contents were hearsay is well taken. However, the error is harmless and does not necessitate a reversal of this judgment.

The exhibit was relevant to the issue of the validity of Pursche's patents and was offered as part of Pursche's proof that his inventions met with a ready market. The telegram purported to show that the royalty accruing to Pursche from International Harvester Co. during a part of the period that International made use of Pursche's patents under a licensing agreement was "about eleven thousand nine hundred forty-two dollars."

But even without this exhibit there was uncontradicted evidence that Pursche received royalties of nearly $25,000 from International and in excess of $75,000 from Atlas, as well as other evidence tending to prove that Pursche's inventions met with a considerable commercial success.

IV. d. *Costs.* The only point remaining is one urged by Pursche on his cross appeal and relates to the provision in the judgment that "[e]ach party shall pay its own costs." Atlas was the prevailing party and the judgment was predominantly in his favor; but these facts did not compel an award to him of costs. The district court held claim 1 of the 090 patent was invalid and that the Atlas B–2, B–3 and B–4 plows did not infringe any of Pursche's patents. The matter of costs is primarily the concern of the district court and under the circumstances of the instant case we cannot say that the denial of costs to Pursche constitutes an abuse of discretion. General Motors Corp. v. Leer Auto Supply, 60 F.2d 902 (2d Cir. 1932); Emerson v. National Cylinder Gas Co., 251 F.2d 152 (1st Cir. 1958); Refrigeration Engineering Inc. v. York Corp., 168 F.2d 896 (9th Cir. 1948), cert. den. 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406; Brunswick-Balke-Collender Co. v. American Bowling & Billiard Corp., 150 F.2d 69 (2d Cir. 1945).

In sum we agree with the judgment of the court below to the extent it adjudicates:

(a) that claims 6, 7, 8, 9, 11, 12, 13, 15, 16, 20, 21, 22, 23, 24 and 27 of the 090 patent are valid.

(b) that claim 1 of the 090 patent is invalid;

(c) that the Atlas B–5 plow infringes claims 12 and 27 of the 090 patent;

(d) that the Atlas B–1 plow infringes all the claims of the 090 patent enumerated above in section (a);

(e) that the "new style" Atlas plow does not infringe any of the claims of the Pursche patents;

(f) that Atlas was guilty of unfair competition;

(g) that an injunction issue restraining further infringement by Atlas;

(h) that each party shall bear his own costs.

However, we disagree with that judgment so far as it holds valid and infringed claims 2 to 5, 10, 14, 17, 18, 19,

25 and 26 of the 090 patent and the 786 and 284 patents; we hold each of these claims of the 090 patent and the 786 and 284 patents are invalid.

The judgment of the district court will be modified accordingly and as thus modified is affirmed.

Neither party is allowed the costs of the appeal.