324 F.2d 555
 139 U.S.P.Q. 230
 INTRICATE METAL PRODUCTS, INC., a corporation, doing
business as Metalcraft Products Co., Appellant,
v.
Charles SCHNEIDER and Signal Manufacturing Co., Inc., a
California corporation, Appellees.
 No. 18372.
 United States Court of Appeals Ninth Circuit.
 Oct. 28, 1963.
 
 Lyon & Lyon, and Charles G. Lyon, Los Angeles, Cal., for appellant.
 Don. B. Finkelstein, Los Angeles, Cal., for appellees.
 Before MERRILL and KOELSCH, Circuit Judges, and BOWEN, District Judge.
 MERRILL, Circuit Judge.
 
 
 1
 Intricate Metal Products, Inc., and Signal Manufacturing Company (both doing business in Los Angeles, California), both manufactured a metal hardware unit for a foldable sofa-bed. They sold these units to furniture manufacturers who would install the units in frames and upholster them, and then sell upholstered units to retail outlets. The mechanism of Intricate's unit constituted a substantially exact copy of Signal's unit.
 
 
 2
 Charles Schneider holds two patents which, he contends, cover mechanical features which were copied. Signal is his sole licensee. Schneider and Signal have sued, alleging infringement of both patents and unfair competition. The district court rendered judgment in their favor upon all claims. Damages were cumulated and damages for infringement were trebled. A total judgment in the sum of $35,962 resulted. Further infringement was enjoined. Intricate has appealed.
 
 
 3
 The two patents are: (1). No. 2,713,690, filed May 12, 1952, and issued July 26, 1955. This has been referred to throughout the proceedings as 'No. 690.' (2). No. 2,878,490, filed February 7, 1955, and issued March 25, 1959. This has been referred to as 'No. 490.' We shall adopt the abbreviated designations in our opinion.
 
 
 4
 Patent No. 690 is designated as a 'bed or divan spring arrangement,' and, as the application states, 'relates to an improved spring structure.'
 
 
 5
 The problem it attacked was that the usual spring structure of a bed or divan, confined within a closed rectangular frame, produced at the ends of the rectangle an uncomfortably rigid and unyielding support. In a divan this tended to cause one sitting at the end to tilt toward the center. In a bed it required a tall person to rest his head or feet on a hard and unyielding cross section.
 
 
 6
 Schneider's solution was an open-ended frame. In place of the rigid end pieces he substituted a flexible chain with sufficient slack to permit it to connect the rigid side pieces in what was designated as a catenary curve, directed inwardly toward the center of the bed. When the spring structure was at rest this curve was maintained by springs connecting the chain, at regular intervals throughout its length, to the link fabric body of the structure. Instead of a rectangle, the structure's outline thus became one with parallel sides and concave or inwardly curving ends.[1]
 
 
 7
 Patent No. 490 is designated as a 'foldable sofa-bed.' The problem it attacked was that prior foldable sofa-bed structures, when in sofa position, had provided an uncomfortably rigid and unyielding front edge for the seat; and a seat one to two inches higher than standard seat height.
 
 
 8
 The problem was met in this fashion: The foot section of the bed structure was composed of a separate and independently stretched piece of fabric, the interior side of which (the side toward the head of the bed) incorporated the flexible-catenary-curve feature of patent No. 690, this time using a wire instead of a chain. When the structure was collapsed into a sofa, the head and intermediate sections of the bed folded underneath the foot section, the fabric of which then became the foundation for the sofa seat. The curved flexible wire thus formed the front edge of the seat, providing a low seat with a yielding front edge.[2]
 
 
 9
 Upon appeal, Intricate contends that neither patent was valid and that neither was infringed.
 
 Patent No. 690
 
 10
 During trial Intricate did not press the contention that No. 690 is extrinsically invalid, and the findings of the district court as to the nature of the prior art with which 690 was to be compared and as to the improvement made by 690 over such prior art cannot be said to be clearly erroneous. Thus, we agree with its conclusion that the device was novel, and hence extrinsically valid. The principal attack on No. 690 is that it lacks intrinsic validity. Intricate asserts that the patent specification does not meet the requirements of 35 U.S.C. 112, in that it does not contain such a description as to enable a person skilled in the art to make or use the device.
 
 
 11
 Its attack is leveled at the description of the curve assumed by the flexible chain as a 'catenary curve.' This, it contends, is by dictionary definition a pure mathematical concept not susceptible of physical representation or practice. The specification, it contends, thus describes an impossibility.
 
 
 12
 We cannot agree. The catenary, according to Webster, is the curve assumed by a perfectly flexible and uniform cord hanging freely between two points of support.
 
 
 13
 While Webster's New International Dictionary (both second and third editions) in its first definition does deal with the term in its pure mathematical sense, it expressly includes in its second definition physical objects in the form of such a curve, exemplified by 'a length of cordage secured to (or in) a piece of fabric in the form of such a curve.' Indeed, the challenged specifications themselves, rather than describing the mathematically ideal catenary curve, refer to the chain only as 'in the form of a catenary curve.'
 
 
 14
 Under these circumstances, to hold these patent specifications insufficient would require 'a hypercritical reading of the claims,' an approach we rejected in Pursche v. Atlas Scraper & Engineering Co. (9 Cir. 1962), 300 F.2d 467, 478, cert. denied (1962) 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 170. As we said in Bianchi v. Barili (9 Cir.1948), 168 F.2d 793, 799, "a patentee has the right to use such words as to him best describe his intention, and they will be so construed as to effectuate that result.' * * * The specification and the claims of a patent are not to be construed with legalistic rigidity.'
 
 
 15
 We conclude that the district court did not err in its determination that patent No. 690 was valid.
 
 
 16
 The district court found infringement of claims 5, 6, and 7. In asserting lack of infringement, Intricate attacks findings to the effect that each element of these claims was incorporated in Intricate's sofa-bed. Intricate contends that four necessary elements are absent from the accused device.
 
 
 17
 First, it does not employ a chain. It does, however, utilize a curved wire whose curve is approximately that of a catenary, and whose tensioning function is identical with that of the chain described in No. 690.
 
 
 18
 Second, the accused device's wire is not, it is contended, appreciably longer than the spacing between the side rails. The patent, however, provides only for 'greater' length than such spacing, and it is clear that the only increase in length contemplated was that required to accommodate the curve in the wire or chain.
 
 
 19
 Third, it is contended that in the accused device the wire is not pivotally connected to the frame. The Signal device uses a nut-and-bolt connection. Intricate uses a metal screw. A demonstration in open court appears to have satisfied the district court that, notwithstanding the difference in precise form of connection, in each device the wire freely pivoted to the extent functionally necessary.
 
 
 20
 Fourth, Intricate denies that its device has coil springs of varying or selected lengths linking the flexible means with the fabric. Its device does, however, use spring links as connections with substantial identity of function, means and result.
 
 
 21
 If, in any minor respect, it may be said that the elements of the accused device differ from those of the claims, nevertheless the two devices are so substantially identical in function, method and result that the doctrine of equivalents clearly applies in favor of the appellees. See Graver Tank & Mfg. Co. v. Linde Air Products Co. (1950), 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; Nelson v. Batson (9 Cir.1963), 322 F.2d 132. Under these circumstances the findings of the district court cannot be held to be clearly erroneous.
 
 
 22
 We conclude that the district court did not err in its determination that patent No. 690 was infringed.
 
 Patent No. 490
 
 23
 As to patent No. 490, Intricate contends that it is extrinsically invalid for lack of invention. We agree.
 
 
 24
 35 U.S.C. 103 provides that '(a) patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'
 
 
 25
 The invention claimed, as we view it, constituted a combination of two ideas. First, the idea of a foot section of the bed composed of a separate and independently stretched piece of fabric, which, when the bed is collapsed, becomes the foundation for the sofa seat. Second, the flexible-wire-in-a-catenary-curve principle.
 
 
 26
 The first idea is old in the art. It is disclosed by at least one of the prior patents in evidence: that of J. J. Wodarsky, issued April 14, 1953.
 
 
 27
 The Wodarsky seat did, it is true, provide the rigid and unyielding front edge which Schneider sought to correct. To accomplish this, however, required no more than the application of the principle disclosed by Schneider's patent No. 690. This principle, applied in the context of a sofa-bed, resulted in no new use or different function or surprising result.
 
 
 28
 In Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corp. (1950), 340 U.S. 147, at pages 150-151, 71 S.Ct. 127, at page 129, 95 L.Ed. 162, the court stated
 
 
 29
 'It is agreed that the key to patentability of a mechanical device that brings old factors into cooperation is presence or lack of invention.'
 
 
 30
 The court then, at page 151 of 340 U.S., at page 130 of 71 S.Ct., 95 L.Ed. 162, quoted the rule expressed in Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp. (1938), 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008:
 
 
 31
 "The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that therefore performed or produced by them, is not patentable invention."
 
 
 32
 The court then added, at page 152 of 340 U.S., at page 130 of 71 S.Ct., 95 L.Ed. 162:
 
 
 33
 'The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable.'
 
 
 34
 Further upon this subject the court, at pages 152-153 of 340 U.S., at page 130 of 71 S.Ct., 95 L.Ed. 162, states:
 
 
 35
 'The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly.'
 
 
 36
 Signal protests that it is error to refer to patent No. 690 as part of the prior art over which No. 490 must be inventive, since the applications for both patents were pending at the same time.
 
 
 37
 We disagree. The first patent does constitute a prior art reference as to what it claimed. The significance of the fact that No. 690 was pending when No. 490 was filed is simply that the inventive advance of 490 must be over what was claimed in the 690 application and need not be over the totality of its disclosure as would otherwise be the case.
 
 
 38
 This was explained in S. H. Kress & Company v. Aghnides (4 Cir. 1957), 246 F.2d 718, 726, cert. denied (1957) 355 U.S. 889, 78 S.Ct. 261, 2 L.Ed.2d 189 where the court stated:
 
 
 39
 'Ordinarily, a patent, to be valid over the prior art, must be an advance over the whole disclosure contained in the specifications or claims of a prior patent. This rule will normally apply even where the applicant is the same person to whom a prior patent was issued, because whatever is disclosed but not claimed by the former patent will be considered as abandoned to the public. However, where the applicant files a second application while the earlier one is still pending in the Patent Office, and the first patent contains disclosures not embodied in the claims, he is not barred from embodying the unclaimed disclosures in the later application. In such case, because the first application has still not been made public when the second is filed, the unclaimed disclosures of the first patent are not deemed an abandonment preventing their being claimed in the second. * * *
 
 
 40
 'To be patentable, however, the claims of the second patent must be for a different invention than that claimed in the first patent. * * * If the second application merely claims the same invention on which the applicant has already been awarded a patent, he will, of course, not be permitted, by double patenting, to extend his monopoly beyond seventeen years. The policy of the law is to protect the inventor by granting him a monopoly for a limited term, but upon its expiration the public is entitled to practice his invention in all its modifications and variations. There is certainly no reason to grant him a monopoly for an extended period upon a variant of his patent which would be obvious to one skilled in the art.'
 
 
 41
 Recently the Court of Customs and Patent Appeals has made the same point in Application of Kiekhaefer (1962), 299 F.2d 866, 868, 49 CCPA 943, where it was stated:
 
 
 42
 'Since appellant's application was copending with that of the Kiekhaefer (also appellant's) patent, the patent is a reference only with respect to what it claims. The issue is whether what is being claimed in the application at bar is subject matter which is patentably distinct from the subject matter already patented to appellant, or whether it is merely an unpatentable improvement thereon or variation thereof.'
 
 
 43
 This court has recognized the rule in Pursche v. Atlas Scraper & Engineering Co. (9 Cir. 1962), 300 F.2d 467, cert. denied (1962) 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 170, which dealt with a problem similar to that now before us. There the basic invention ('090) was a plowing assembly which was mounted on wheels. Later patents ('786 and '284) consisted of the basic assembly mounted on a tractor rather than on wheels. The district court had held the later patents valid and inventive in their means for the tractor mounting. This court held that there was a lack of invention, stating at page 480 of 300 F.2d:
 
 
 44
 'We are, of course, aware that the application for the 786 and 284 patents were co-pending with, but issued several months later than, the 090 patent, and that while co-pending applications '* * * are not technical references in the sense that a timely granted patent to a third person might have been, it is * * * perfectly proper to look to them for what they claim, and when two applications are presented to * * * an inventor it is proper 'to hold the one unpatentable in view of the prior art and the claims upon which the other was patented."'
 
 
 45
 See also Pierce v. Allen B. Du Mont Laboratories, Inc. (3 Cir. 1961), 297 F.2d 323, cert. denied (1962) 371 U.S. 814, 83 S.Ct. 24, 9 L.Ed.2d 55.
 
 
 46
 In Weatherhead Co. v. Drillmaster Supply Co. (7 Cir. 1955), 227 F.2d 98, 102, the court uses language peculiarly appropriate here:
 
 
 47
 'The principal reason for prohibiting double patenting, is to prevent inventors from getting more than the seventeen year monopoly on one invention. An extension of monopoly is only justified by the presence of invention which grants the second application as much dignity as the first. In the instant case, for example, the appellants have absolutely nothing to gain by patent 217 except an extension of their monopoly by almost one year. No one could manufacture the device claimed in 217 without infringing 413. * * * The later patent is not at all necessary to protect the packing ring described therein * * *.'
 
 
 48
 In the case before us, No. 490 does not claim unpatented disclosures of No. 690. Rather, it incorporates the claims of the earlier patent in combination with other disclosures of prior art. As in Weather-head (and as we have already demonstrated here), no one could manufacture the 490 sofa-bed without infringing No. 690. No. 490 is not necessary to protect the low and soft seat features of the Signal sofa-bed.
 
 
 49
 Schneider has nothing to gain by No. 490 except a four-year extension of the monopoly of 690.
 
 
 50
 We conclude that patent No. 490 is invalid for lack of invention and that the district court was in error in holding otherwise.
 
 Unfair competition
 
 51
 With reference to unfair competition the district court found:
 
 
 52
 '28. The appearance of the particular foot-bed section of plaintiff Signal Manufacturing Co., Inc.'s foldable sofa bed exemplified by plaintiff's exhibit 1 has achieved widespread identification with plaintiff Signal Manufacturing Co., Inc. as the sole and only source of foldable sofa beds having this construction, appearance and form. '29. The accused device incorporates a foot-bed section that is virtually identical in appearance to the foot-bed section of plaintiff Signal Manufacturing Co., Inc.'s foldable sofa bed. Defendant provides a cardboard sheet over their foot-bed section and imprinted thereon is the legend 'Styled in Steel by Metalcraft Products Co.' This cardboard sheet on the accused device is discarded by the furniture manufacturer at the start of the installation of the unit in a frame. This sheet is insufficient to give notice as to the source of the accused device and there is likelihood of confusion as to the source thereof.'
 
 
 53
 To recover for unfair competition appellee was required to show that prospective customers would attach special significance or 'secondary meaning' to the appearance of the Signal unit as identifying a particular manufacturing source, and that as a result the substantial copying of that unit by Intricate would be likely to mislead such customers into purchasing the Intricate unit in belief it emanated from the familiar source. See e.g., Hygienic Specialities Co. v. H. G. Salzman, Inc. (2 Cir. 1962), 302 F.2d 614, 619-620.
 
 
 54
 Intricate contends that there is nothing in the record from which the district court could have found customer confusion; that the similarity in appearance of the accused device and that manufactured by Signal does not suffice. We agree.
 
 
 55
 The only evidence of confusion to which we are referred is testimony of furniture manufacturers to the effect that upon being invited to examine the accused sofa mechanism, they could not tell it from Signal's, and thought that it was Signal's. There is no testimony that anyone ever bought the accused mechanism mistaking it for Signal's. An inference that such a result would follow from similarity of appearance, while perhaps appropriately applied in the case of the housewife in the supermarket, is completely inappropriate in the case of such knowledgeable customers as furniture manufacturers. The workmen might well be confused, but hardly the purchaser.
 
 
 56
 Further, we are dealing here with a metal hardware mechanism which, since it eventually is buried beneath upholstery, is almost exclusively functional. Not only is it extremely unlikely that 'secondary meaning' would attach to such merely functional attributes, but in any event the principle has developed that the interest in free competition and in economic and technological progress should permit imitation of functional features in the absence of a patent or copyright. See Pagliero v. Wallace China Co., Ltd. (9 Cir. 1952), 198 F.2d 339, 343; Restatement, Torts, 741(b)(i), (ii) and comment (j).[3] A 'functional' feature, for this purpose, is one which 'affects' the 'purpose, action or performance, or the facility or economy of processing, handling or using' the product. Restatement, Torts, 742. On the other hand, a 'nonfunctional' feature-- the type which may not be confusingly imitated if it has acquired secondary meaning-- 'is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product * * *.' Pagliero v. Wallace China Co., Ltd., supra.
 
 
 57
 Here, when the manufacturer witnesses were asked to explain their impressions of confusing similarity they specified the separate fabric in the foot-bed section of each unit, the similar manner in which both fabrics remained in tension and in which the curved wires were attached to the fabrics and to the frame, and the same types of end support. These aspects would clearly appear to be functional, rather than 'nonfunctional' features.
 
 
 58
 It is suggested that secondary meaning and customer confusion may attach to the soft seat which the Signal sofa-bed provided, since the testimony shows that some customers of furniture manufacturers desiring the Signal type of sofabed, instead of ordering by name, specified simply the 'soft seat.' The testimony included the following:
 
 
 59
 'Q. * * * When your customers referred to the unit with the soft seating * * * you interpret that to mean it is the type of construction shown on plaintiff's exhibit 1? A. Yes I do.'
 
 
 60
 To permit the law of unfair competition to protect from imitation the 'soft seat' would be to permit it to protect the very device covered by patent, which would serve to extend the patent monopoly indefinitely if not permanently.
 
 
 61
 We conclude that the court's findings with reference to secondary meaning and customer confusion were clearly erroneous; that judgment for unfair competition must be reversed.
 
 Relief
 
 62
 The result of our determinations thus far is that while Intricate is in infringement of Schneider patent No. 690, for which Schneider and Signal are entitled to damages and to an injunction against further infringement, the allowance of additional damages for infringement of No. 490, or for unfair competition, was error.
 
 
 63
 Damages for infringement were fixed by the court throught applying the reasonable-royalty-rate method.[4] During the period of infringement (May through August, 1962), Intricate manufactured 2322 accused devices. The court found a reasonable royalty rate for patent No. 690 (a royalty 'that the plaintiffs should be willing to accept and the defendants should be willing to pay') to be $2 for each device, and for No. 490 to be $3. These infringements were treated by the court as separate and independent torts.
 
 
 64
 Applying the $2 rate to the number of devices manufactured, the court's judgment for compensatory damages for infringement of 690 amounted to $4,644. Finding that the infringement was willful and deliberate, the court further granted exemplary damages in the sum of $9,288.
 
 
 65
 The injunction of August 24, 1962, must be amended to eliminate reference to infringement of patent No. 490, and to unfair competition. Judgment of the district court must be reduced to the sum of $13,932. As so modified, judgment is affirmed. No costs are allowed.
 
 
 
 [1]
 This is typically described in claim No. 5 as follows:
 'Means for yieldably supporting an end of a flexible fabric between a pair of spaced parallel frame members, said fabric normally lying and supported in the plane defined by said frame members, and comprising in combination therewith: a non-stretchable flexible continuous chain having opposite ends thereof pivotally connected to said frame members and having a length greater than the spacing between said frame members; and a plurality of coil springs of selected length and tension disposed between said frame members in spaced relation and interconnecting said flexible chain to the end margin of said fabric whereby said flexible chain normally lies in the plane of the frame members and in the form of a catenary curve.'
 
 
 [2]
 This is typically described in claim No. 1 as follows:
 'In a foldable sofa bed including a plurality of pivotally interconnected head, body, intermediate, and foot bed frame sections, said frame sections being extendable to form a bed and foldable to form a sofa seat, the provision of: means carried by said head, body and intermediate bed frame sections including longitudinally and laterally stretched fabric means; and fabric means normally lying in the plane of said foot section stretched independently of the fabric means lying in the plane of said other frame sections, said fabric means in said foot bed section including a curved flexible wire member provided with a pivotal connection at each end secured directly to said foot bed frame section and having a nonvarying length greater than the distance between said pivotal connections, said flexible wire member lying in the plane of said foot bed frame section, and the rear of said fabric means on said foot bed section being attached to said foot bed frame section only at said pivotal connection.'
 
 
 [3]
 The Restatement, supra, would allow recovery for a confusing copying of functional features that have secondary meaning only if the imitator 'does not take reasonable steps to inform prospective purchasers that the goods which he markets are not those of the other.' Here this requirement, assuming its applicability, would seem amply satisfied in view of the cardboard sheet and legend, mentioned in the findings, supra, that was attached to each Intricate unit, and the general fact that Intricate's sales were to knowledgeable manufacturers rather than on a public market
 
 
 [4]
 35 U.S.C. 284, provides that upon a finding of infringement 'the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer * * *.'